## No. 10,870.

### MRS. SALLY C. PUGH VS. MOORE, HYAMS & CO.

1. If a broker or other agent transfer paper by delivery without disclosing who his principal is, he is himself to be regarded as a principal in the transaction, and the party responsible to refund money paid for bonds which were valueless.

2. The term assignment is applied to the transfer of instruments which are negotiable without endorsement. If a bond is not a valid subsisting obligation according to its purport the assignor is liable in a suit to recover amount paid him, as the price, because it was not that which it was held to be, and the assignee did not receive any consideration.

3. A State bond in negotiable form, which has come into the hands of innocent holders after having been fraudulently reissued from the Treasurer's office, is subject to defence.

4. An officer can not ratify an irregular issue of securities of the State or give value to paper issued *ultra vires*, or fraudulently.

5. The State is not liable for its paper promises fraudulently issued and put into circulation, not even when put in circulation by its Treasurer.

14

APPEAL from the Civil District Court for the Parish of Orleans. King, J.

Charles F. Claiborne, for Plaintiff and Appellee, cited: 20 Wendell 533; Daniel, Negotiable Instruments, Secs. 305, 308; Tiedmen, on Commercial Paper, Sec. 85; 2 Parsons on Bills, pp. 38 and 39; 4´ N. S. 528; 2 An. 559; 14 An. 444; C. C., Art. 2474 and seq.; Troplong, Vente, 2 Vol., Secs. 934, 932; Aubry and Rau, p. 442; 16 Duranton, Sec. 510; 24 Laurent, Secs. 542, 543; 6 Marcadé, on Art. 1693, p. 351, Sec. 1.

Bayne, Denegre & Bayne, for Defendants and Appellants, cited: C. C. Art. 3018; 12 M. 84; 11 An. 170; 20 An. 564; 92 U. S. 447; 124 U. S. 545; 7 Wall. 557; 15 Pet. 377; 91 U. S. 398; 31 An. 175; 107 U. S. 740; 97 U. S. 445; 91 U. S. 398; 28 An. 552.

H. L. Lazarus, Amicus Curiæ.

The opinion of the court was delivered by

BREAUX, J. Plaintiff sues to recover of defendants the amount paid them for five State bonds she alleges are worthless.

They were bought by her on the 24th of April, 1889, for the sum of $4443.75.

She subsequently discovered that these bonds were not valid, and that the State claimed them, as they had been fraudulently reissued.

Four of them are numbered 742, 842, 866 and 883, and are part of the consolidated bonds held by the Treasurer of the State of Louisiana for the use of the "Agricultural and Mechanical College," and which are null and void since the 1st day of January, 1880, under Article 233 of the Constitution. In addition to their nullity, this article prescribes that the General Assembly shall never make any provision for their payment, and that they shall be destroyed.

. Another of the bonds bought is numbered 5611, and is a consolidated bond which had been exchanged under Act 121 of 1880, for a constitutional bond.

The act just quoted orders in matter of the exchange of constitutional for consolidated bonds, that the Treasurer, before delivering the former, shall designate in blank kept for the purpose, on the face

thereof, the number of the old consolidated bond for which the new was given in exchange, and shall stamp the consolidated bond received, after having detached from it the coupon which fell due on the 1st of January, 1880.

Reports were to be made by the Treasurer to the Auditor at the end of each quarter, showing the number and denomination of all the consolidated bonds stamped as required. They were to be destroyed.

It was under the provisions of the said act that this bond 5611 was received by the Treasurer.

Plaintiff tendered the bonds to the defendants and demanded valid bonds in lieu, or the price.

The defendants in their answer plead, that they acted as brokers, and not as vendors; that these bonds were negotiable instruments, not yet due, transferable by delivery, and 'did not entail any liability or warranty upon the vendor, and that they had been issued by the State and put in circulation by its officers for full value, and that their rights are protected by the Constitution and laws of the United States and the law merchant, by which they must be decided.

There was judgment for plaintiff and the defendants have appealed.

With reference to the capacity in which the defendants acted, whether as brokers or principals, we summarize the evidence as follows:

That defendants are brokers by occupation, and that at the date of the sale of these bonds to the plaintiff they were engaged in buying bonds for themselves and others; that plaintiffs' agent asked a member of the defendant firm to let him have some of these bonds for his principal at cost price.

That this was declined unless a broker's commission was paid; that this the agent finally consented to pay.

This is corroborated by another member of the firm.

The agent corroborates these statements in some particulars, but denies that he dealt with the defendants as brokers and that there was any brokerage compensation.

It appears that no statement of the purchase was made and handed to the purchaser, as is customary when brokers act for third parties.

That the defendants did not at any time make known to plaintiff who was the principal and owner of these bonds, if they were not.

With reference to the fraudulent reissuing of the "Mechanical and Agricultural College" bonds Nos. 742, 842, 866 and 883 and the possession of the state:

The facts are that they were designated in statement "E" of the report of the State Treasurer to the Governor for the year 1879, from which we copy:

*To His Excellency F. T. Nicholls, Governor of the State of Louisiana:*

SIR—In accordance with the requirements of law (Art. No. 96, Extra Session, Section 80, of 1877) I respectfully submit the following report of the financial operations of this department for the past fiscal year, commencing the 1st day of January, 1879, to the 31st day of December, 1879, inclusive, embracing its receipts, disbursements, etc., from the various funds, as provided by existing laws.

The treasurer's report consists of statements A, B, C, D and E.

Statement " A " shows an account       *       *       *       *       *

Statement " B " shows an account       *       *       *       *       *

Statement " C " shows an account       *       *       *       *       *

Statement " D " shows an account       *       *       *       *       *

Statement " E " shows a detailed statement of the bonds held by the State Treasurer in trust for the Mechanical and Agricultural College, and the bonds belonging to the Louisiana State University; also of the bonds returned by A. Luria, cashier Louisiana National Bank, on June 7, 1878, in exchange of warrant No. 2222 as *per* judgment of the Third District Court of New Orleans, No. 25,115, and of the Supreme Court of Louisiana, No. 7149, and pledge of the lessees of the Louisiana State penitentiary, etc.

The residue of the report is a compilation of the monthly reports of the banks, banking institutions, savings banks, etc., published in accordance with the provisions of Art. 91 of Section 6 of 1877.

All of which is respectfully submitted.

(Signed)                          E. A. BURKE, *State Treasurer.*

Extract from the said report:

" STATEMENT ' E.'

" Description of bonds on hand in the State Treasury held by, and belonging to, the 'Agricultural and Mechanical College,' and to the 'Louisiana State University,' etc.

" ' MECHANICAL AND AGRICULTURAL COLLEGE,'

One hundred and ninety-six bonds of $1000 each, issued by the State of Louisiana, under Act No. 3 of 1879, Nos. 710 to 905 inclusive, ' $195,000.

Necessarily including the bonds involved in this suit, viz.: Nos. 742, 842, 866 and 883.

Other official reports, of subsequent date, were offered in evidence. They were objected to on the ground that they were not the best evidence which could be produced.

The court overruled the objection and admitted the testimony.

The first report, that of 1879, shows that the bonds were in the treasury at the time it mentions, and while those made subsequently do not, from personal knowledge, establish that they were in the treasury in 1879, nevertheless they tend to prove the correctness of that of 1879. The records of the State make proof of the verity of their contents. Best on Evidence, p. 454.

The fact that the Treasurer was indicted in 1888 for alleged criminality in the fraudulent reissue of these bonds, and that he is a fugitive from justice, will not destroy the effect of records as evidence accepted at all times as correct previous to 1888.

With reference to the consolidated bond (5611), it is proven that in 1883 it was presented to the State Treasurer to be exchanged for a constitutional bond. It was exchanged and extinguished.

The State claims their return and refuses to recognize them as a debt.

## THE BROKERS' RESPONSIBILITY IN TRANSFERRING BONDS BY DELIVERY.

The first proposition presented by the defendants is that they acted as brokers, and are not indebted for the amount claimed.

In considering this defence, it is necessary to determine what are the functions of a broker.

He is an intermediary employed to negotiate a matter between two parties, and for that reason is considered the mandatary of both. When he is the mandatary of the purchaser and buys from a third party, the agency must be disclosed, either at the time of the contract or at the trial, in order that he may be considered the broker and relieved from all responsibility as principal.

If the plaintiff has a right of action, it can not be defeated, as in this case, by withholding the name of the principal and pleading the exemption of a broker.

We quote from Daniels, Vol. 1, p. 684:

" It is quite clear that if a broker or other agent transfer property by delivery without disclosing who his principal is, he is himself to be regarded as principal in the transaction, although the party dealing with him may have known that he was the broker and agent for some person.

"And this doctrine has been applied to compel a broker to refund money paid for note sold by him to the plaintiffs, although he had paid over the money to the principal."

LIABILITY OF THE ASSIGNOR OF BONDS PAYABLE TO BEARER.

In the order of the defence the defendants next contend that it is well established that the buyer has no cause of complaint if he gets the exact thing he buys; that each had the same means of information; neither had any suspicion that there was anything wrong with the bonds, that it was an ordinary case of bargain and sale, but essentially a transaction in which both took their chances of loss, that these bonds were current in the market as Louisiana State bonds.

The representations made by vendors were in good faith and believed by both parties to be true, that they were selling valid bonds of the State of Louisiana.

The unquestioned intention of the plaintiff was to buy valid obligations of the State; instead, she received five bonds that were null and void.

For these she paid a price for which she did not receive any consideration.

The question for our determination, on this point, is whether a purchaser who buys bonds in the market must lose the price, if he receives fraudulent reissues of bonds instead of valid and binding obligations upon the State, which he intended to buy. This question involves the necessity of deciding what are the liabilities of assignors of instruments payable to bearer.

The assignor of such an instrument guarantees that he has a good title to the instruments and has a right to sell them.

The illegality of the instruments constitutes a failure of consideration.

Knowledge of the illegality on the part of the vendor is not essential to make him liable for the price received.

"We think whoever gives negotiable paper, transferable by delivery, warrants that the signatures are genuine." And Mr. Justice Story, in his work on promissory notes, lays it down that there is a warranty of title. Promissory Notes, Sec. 118.

He warrants "by implication, unless otherwise agreed, that its face is a true description of its character, both in respect to its genuineness, to its validity and legal operation, to the competency of the parties, and also that he is the lawful holder, having a valid title and right to transfer it, and that he has no knowledge of any facts which prove the paper, as originally valid, to be worthless, either by the insolvency of the principal, or by having been paid, or otherwise by having become void and defunct." Daniel, Sec. 737, 3 Ed.

The assignor engages that the instrument is what it purports to be, i. e., the valid obligation of those whose names are upon it.

The rule, says Judge Parsons, is of universal application that the vendor, without endorsement, warrants that the paper is of the kind and description it purports to be.

This is a well settled principle of commercial law, i. e., implied warranty in sales as applicable to negotiable instruments transferable by delivery.

An exception arose under a decision of the United States Supreme Court and a different rule was announced as applying to assignors and assignees of government securities, i. e., that the assignor does not impliedly guarantee that the officer has authority to issue the securities he transferred by delivery. In Otis et. al. vs. Cullom, receiver, 92 U. S. 447, a city bond issued in Kansas was sold to plaintiffs.

The court held the bond void on the ground that the Legislature had no power to adopt the act authorizing its issue.

The transferrees sued to recover back what they had paid for the invalid bond.

The court held that in such cases there is only an implied warranty of title and genuineness, and that if there was no guaranty and no fraud or misrepresentation on the part of the vendor the transferees were without rights to recover.

This case followed Lambert vs. Heath, an English case (15 Mee. and W. 486). The rule is the same in both. In the last case the de-

fendant bought for the plaintiff certain certificates of Kentish Coast Railway scrip.

The directors repudiated the scrip on the ground that the secretary had acted without authority in issuing them.

An action was brought to recover back the money paid for these invalid scrips.

The court said: "The question is simply this: Was what the parties bought in the market Kentish Coast Railway scrip? It appears that it was signed by the secretary of the company, and if this was the only Kentish Coast Railway scrip in the market, as appears to have been the case, and one person chooses to sell and another to buy, then the latter has got all that he contracted to buy."

In both of these cases all the securities were null and void.

In the case at bar only comparatively few bonds were worthless, and it happens in buying a larger number those sued on were of the worthless.

In a Nebraska case the distinction was made that there were two sets of securities in the market of the same general description, one legal and the other illegal, proof of which fact enabled the purchaser of the illegal securities to recover back the purchase money, on the ground that he had purchased something very different, viz.: the legal security of the same description. 12 Neb. (1888) 28.

Judge Daniel, referring to this case, says, Vol. 1, Sec. 734: "The distinction is a clear one, and the decisions of the Supreme Court, limited to the facts of the case before it, is not irreconcilable with the general principles stated in the text, to which we have had occasion to refer as applying to this case.

" While an assignment is not equivalent to an endorsement, a transfer without endorsement is of the same force as a sale of goods, and does not fall under mercantile law." Randolph on Commercial Paper, Vol. 11, p. 442.

The principles of implied guarantee by the assignors of securities payable to bearer is but slightly removed, if at all, from those laid down in the Civil Code respecting the liability of the vendor.

The seller is bound to warrant the thing which he sells, to maintain the buyer's peaceable possession, and to guarantee against the hidden defects of the thing sold.

"He who sells a credit or an incorporeal right warrants its existence at the time of the transfer, though no warranty be mentioned in the deed." C. C. 2646.

The authorities agree that the assignor of a security transferable by delivery warrants that it is not fictitious.

The defendants contend that plaintiff had the knowledge they had with reference to these bonds; each had the same means of information; neither had any suspicion that there was anything wrong about the bonds.

That is undoubtedly true. Against each of the parties to the suit the same presumption arises, that they had knowledge of the laws relating to these bonds. They had the notice every one is presumed to have of the law.

The fact remains that in an intended purchase plaintiff has paid an amount for which she did not receive anything in return.

THE STATE IS NOT RESPONSIBLE FOR BONDS FRAUDULENTLY REISSUED IN VIOLATION OF HER LAWS.

The third and last ground of defence is, that the defendants were holders for value before maturity of negotiable paper of the State of Louisiana, and that, applying the law governing commercial paper, she is liable, and has incurred all the responsibilities of private persons under the same circumstances.

While this is in the main true, the State is not lightly exposed to pay its securities twice.

These bonds could not have any legal vitality after they were withdrawn from commerce.

The embezzlement committed in reissuing them, and the flagrant violation of law, made them valueless in any hands.

It is settled that debts unlawfully contracted by a municipal corporation are not binding upon it, although negotiable in form.

If there is no authority to issue its bonds or commercial paper, there can be no *bona fide* holder in the commercial sense of the term. Townsip of East Oakland vs. Skinner, 4 Otto, 255; Marsh vs. Fulton County, 10 Wall. 676; School Directors vs. Fogleman, 76 Ill. 189; Cecil vs. Board of Liquidation, 30 An. 34.

In Chisholm vs. The City of Montgomery, 2 Woods, p. 594, it was held that the negotiable form of the security did not preclude the defendant from denying the authority of the officers by whom the

faith of the city had been pledged; that the officers and agents of private corporations, entrusted by them with the management of their own business and property, may subject their principals to the consequences of their unauthorized act, but that the body politic is not thus bound by the acts or declarations of its agents. "If it could be, unbounded scope would be given to the peculations and frauds of public officers;" that third persons holders of the bonds were bound to take notice of the defects.

These and other exceptions have led us to the conclusion that all the responsibilities of private persons do not form part of the obligations of municipal corporation on its bond, nor of the State.

In John S. Caguin, Respondent, vs. The Town of Hancock, 84 New York, it was held that there can be no *bona fide* holder of town bonds within the meaning of the law applicable to negotiable paper, as they are only binding upon the town when issued in the way pointed out by statute.

In Moffat vs. United States, 112 U. S., the court decided that the United States do not guarantee the integrity of its officers and hold themselves bound by their misconduct or fraud.

Says the court in that case: "The position that as the frauds charged were committed by officers of the United States, the court erred in not holding their acts to be binding, and in not giving to the patents the force of valid conveyances, is certainly a novel one. The government does not guarantee the validity of the acts of its officers. It prescribes rules for them, requires an oath for the faithful discharge of their duties, and exacts from them a bond with stringent conditions. It also provides penalties for their misconduct and fraud, but there its responsibility ends. They are but the servants of the law, and, if they depart from their requirements, the government is not bound. There would be a wild license to crime if their acts, in disregard of the law, were to be upheld to protect third parties." See also District of Columbia vs. Cornell, 130 U. S., p. 665.

The State government requires similar formalities to be complied with by its officers. The required oath was taken and bond furnished.

The criminal statutes provide punishment against their frauds. If with these requirements the responsibility of the United States ends, for similar reasons that also of the State ends.

Pugh vs. Moore, Hyams & Co.

"It has been held in England in recent cases that a corporate bond in negotiable form, which had come into the plaintiff's hands for value after having been stolen from the rightful owner, was subject to defence." Randolph on Commercial Paper, Sec. 327.

Free school bonds were sold by the Auditor and Treasurer under act 81 of 1872.

The court declared the act unconstitutional, and denounced it as an act of spoliation, intended and designed to deplete the treasury of every available asset or fund. State of Louisiana vs. Durant, 29 An. 81.

The Sun Mutual Insurance Company became the owner of eleven of these bonds before maturity for valuable consideration. Suit was brought by the company against the Board of Liquidation to have them funded.

The court decided against the application to fund, and held that the laws of 1855 and 1857 setting aside these bonds for the schools took them out of commerce, and that third persons, however innocent, could not hold them as owners.

These bonds were sold under some color of law. The sale had legislative sanction, and the Auditor and Treasurer acted in compliance with a statute which was subsequently declared unconstitutional.

In the matter of the bonds now under consideration, their reissue from the treasurer's office was an outrageous fraud which absolutely vitiates them in any hands in which they may be found.

By taxation, private property is appropriated to public ends and legitimate purposes. The element of negotiability of bills, notes and bonds makes a contract founded upon paper adopted for circulation different, in meny important particulars, from other contracts known to the law.

That element loses all force when paper has been placed in commerce, in violation of law, to perpetrate a frand upon the State.

The holder of the bonds of a municipal corporation is bound to look to the action of the officers and ascertain whether the law has been so far followed by them as to justify the issue.

The rights of a State can not be less. The decisions relating to private corporations and to persons do not apply against the State.

The State's authority to issue bonds is founded on law, of which every one is presumed to have knowledge.

Those who deal in State securities will be presumed to have examined them and to have known whether they could be in commerce.

The dealer in bonds of private corporations, or in bills and notes of individuals, has not the same opportunity of examination and the same presumption of law does not arise.

The by-laws of corporations are not open to inspection by those who deal in securities.

Those who dealt in State securities had opportunity to know whether the treasurer had any lawful right to issue them, for the reason that his authority, if any existed, was to be found in public statutes; and if they did not, in fact, examine, as it was their privilege to do, before buying, they will be presumed to have done so and to have known that they were issued, without authority of law, and therefore void in the hands of any holder, either with or without notice.

The bonds sued upon are the property of the State, and were within her reach and in her possession when they were ordered to be destroyed.

In argument, it is urged that the State is estopped by the information given by one of her officers that the bonds sued upon were valid bonds.

If that plea were maintained it would be equivalent to maintaining a ratification. No such ratification could be made.

We have found no grounds to reverse the judgment appealed from.

Judgment affirmed, at defendants' costs.

---

### CONCURRING OPINION.

FENNER, J. The case presents two questions, viz.:

1. Are the bonds in controversy valid and subsisting obligations of the State of Louisiana? If so, plaintiff has received all that she bought, or intended to buy, and has nothing to complain of.

2. Even if said bonds are invalid, are the defendants bound to reimburse the price they received for them?

I.

It is shown that four of the bonds are consolidated bonds of the State, which, on and prior to the first day of January, 1880, were held by the State "for the use of the Agricultural and Mechanical College Fund." As to these bonds, the Constitution of the State, Art. 233, declares: "The consolidated bonds of the State now held by the State for the use of said fund shall be null and void after the first day of January, 1880, and the General Assembly shall never make any provision for their payment, and they shall be destroyed in such manner as the General Assembly may direct."

The remaining bond in controversy is a consolidated bond which had been surrendered to the State in exchange for a constitutional bond, in pursuance of the provisions of the State debt ordinance, which, by virtue of its ratification by the people, became a part of the Constitution.

At its first session after the adoption of the Constitution, the General Assembly passed an act providing for the cancellation and destruction of the bonds so surrendered and exchanged. Act 121 of 1883.

Instead of retaining, canceling and destroying these bonds which had thus been conclusively extinguished and rendered null and void by the mandate of the Constitution, it appears that the then Treasurer of the State fraudulently abstracted them from the treasury of the State and placed them on the market.

The proposition that such fraudulent act could have effect to revise the extinguished obligation of the State upon these bonds, or could confer upon the existing government of the State any right or power to make provision for their payment in the teeth of the positive prohibition of the Constitution, seems, to me at least, to involve the assertion of nothing less than an extravagant impossibility.

What function or power has this court, except to administer and apply the Constitution and laws of the State? We have quoted the provisions of the Constitution and laws bearing on this case. Are they ambiguous? No. Are they beyond the legislative authority which adopted them? No. Then whence can this or any court derive the power to nullify them?

We might rest our conclusion with absolute security upon two prior decisions of this court rendered in cases absolutely analogous

to the instant one in every feature, save that in those cases there was no intended fraud, but that the bonds had been emitted in virtue of authority conferred by an act of the Legislature, regularly passed, but which the court held to be unconstitutional; and surely no one could contend that the illegal act of an executive officer could have greater effect in defeating the constitutional rights of the State than a like act of the General Assembly approved by the Governor.

In the cases referred to, as in this, the bonds were originally valid bonds of the State; they belonged to a series of bonds of which many were still rightfully outstanding and from which they were undistinguishable in any respect except as to the numbers which they bore; they were negotiable in form and were held by purchasers in open market and before maturity, and with no other notice "than would result from their presumed knowledge of the acts and proceedings of the State and its officials."

The same arguments, based upon the law of negotiable instruments, were addressed to the court then as now; but the court, after reciting the constitutional and legal provisions which prohibited the emission of those particular bonds, said: "These laws, to all intents and purposes took these bonds out of commerce. They were placed in the special and joint custody of the Secretary of State and Treasurer, who were required to execute duplicate receipts therefor, and to be and remain a perpetual fund inviolably appropriated to support of public schools. They ceased to be negotiable by virtue of these positive declarations of legislative will, and the usages and laws of commerce relative to negotiable paper are superseded by these positive enactments, and are inapplicable to the case. We follow the commercial law only when it does not conflict with statute laws of the State, but no further. It is within the power of the State to destroy the negotiability of all paper, and to withdraw from commerce such things as it may deem proper." Sun. Mut. Ins. Co. vs. Board, 31 An. 175; State ex rel. Durant vs. Board, 29 An. 77.

These decisions are, for us, the highest of all judicial authority, as to the subject matter of which they treat—higher even than that of the Supreme Court of the United States, unless it can be shown that they involve some federal question on which we acknowledge the paramount authority of that high tribunal.

We can discover no federal question in those cases or in this. Nobody would seriously question the power of the State to modify, repeal or abrogate the law merchant, except, at least, in so far as such action might impair contract rights existing at the date of such legislation; and, inasmuch as the rights here involved necessarily arose after the date of the legislation, and after the facts which gave effect thereto, this possible exception can not apply.

In absence of any federal question it may be confidently asserted that in such a case, involving simply the interpretation and application of the Constitution and laws of the State, the Supreme Court of the United States, in accordance with its conservative and settled policy, would adopt and follow the decisions of this court.

Such, nevertheless, is my respect for that court, and my desire to maintain harmony between federal and State jurisprudence, that any clearly conflicting decisions rendered by it would arrest my grave attention to the merits of such a conflict as determining whether we should maintain or overrule the prior decisions of this court.

I fail to find anything in the federal decisions referred to which conflicts with the decisions above referred to.

The Supreme Court of the United States has emphatically repudiated the doctrine that the government can be bound by the frauds of its officers. We quote its language:

"The position that, as the frauds charged were committed by officers of the United States, the court erred in not holding their acts to be binding, and in not giving to the patents the force of valid conveyances is certainly a novel one. The government does not guarantee the integrity of its officers nor the validity of their acts. It prescribes rules for them, requires an oath for the faithful discharge of their duties, and exacts from them a bond with stringent conditions. It also provides penalties for their misconduct or fraud, but there its responsibility ends. They are but the servants of the law, and if they depart from its requirements the government is not bound. There would be a wild license to crime if their acts, in disregard of the law, were to be upheld to protect third parties, as though performed in compliance with it." Moffatt vs. United States, 112 U. S. 24.

From this doctrine it has never deviated by a hair's breadth save in one case, viz.: Cooke vs. U. S., 91 U. S. 389. That case, like the

case of State vs. Wells, Fargo & Co., 15 California, 336, involved no question of constitutional prohibition and none of the power of the government to pay. Both were cases in which the government had actually paid the obligations and was seeking to recover the amount so paid to *bona fide* holders.

In Cooke's case the instruments which had been illegally issued and had been actually redeemed by the United States were treasury notes, printed by the government, perfect in form, complete and ready for issue, intended to circulate and take the place of money, not differing, as ¦the court said, "from coins of the mint when fully stamped and prepared for issue," and made a legal tender for the payment of government dues. We can well understand the vast importance to the government of preserving the circulating money of the country from all taint of possible doubt or suspicion, and under the stress of that motive the majority of the court denied the right of the United States to recover. But even in that case Justice Miller took no part, and Justices Clifford, Field and Bradley dissented on the trenchant ground "that the United States are not liable for its paper promises fraudulently or surreptitiously put into circulation, not even if the fraudulent act was perpetrated by treasury officials."

A like question came before the court in a later case, and reference was made to the decision in Cooke's case, and the unanimous court there referred to the particular circumstances presented therein, and which I have recited above, and said: "We are not prepared to extend the scope of that decision." The court then held that the District of Columbia could not be held bound to even a *bona fide* holder of its negotiable paper not due, which had been redeemed and canceled by the District and had thereafter been abstracted, the cancellation mark erased with detersive soap and fraudulently put in circulation. District of Columbia vs. Cornell, 130 U. S. 655.

Although, in the instant case, the fact of cancellation is wanting, I fail to perceive any distinction between a fraudulent failure to cancel when the law required it and a cancellation so made that it could be fraudulently effaced. In both cases the instruments found their way into circulation through the fraud or fault of the officers, and the *bona fide* taker was no better protected by an inefficient cancellation, the evidence of which had been destroyed, than by the absence of any cancellation at all.

I consider, therefore, that the decision in Cooke's case, restrained as it is by the later decision referred to, has no application to the facts of this case, and that the last decision does apply to the facts here and confirms the decisions of our own court.

The instant case, however, presents one feature which separates it, by an impassable gulf, from the cases of Cooke and Cornell, viz.: the fact that the Constitution of the State extinguishes these obligations and forbids the General Assembly from ever making any provision for their payment.

## II.

On the question of the obligation of the defendants to refund the price received for these invalid bonds, I consider it incontestable.

1. The views above expressed and the decisions quoted hold that the bonds in question had lost the character of negotiable instruments. It follows that defendants' obligations are governed, not by the law merchant, but by the provisions of the Civil Code regulating the contract of sale of non-negotiable incorporeal rights. A mere reference to the articles of the Code clearly shows that the vendor of such a right warrants its existence and validity. Rev. C. C. 2474, 2475, 2476, 2500, 2520, 2646.

2. Even were it admitted that the bonds retained the characteristics of negotiability as between the parties to dealings in them, I consider that under the law merchant the assignor warrants the genuineness, the validity and legal operation of the negotiable instruments assigned by him. Benjamin on Sales, 4 Ed., p. 695; Daniel on Neg. Inst., Secs. 730, et seq.; Tiedeman on Com. Paper, Secs. 244, et seq.; 2 Parsons on Bills, pages 37 and 42; Young vs. Cole, 3 Bing. N. C. (Eng.) 724; Westrop vs. Salomon, 8 C. B. 345.

This question also has been decisively settled by this court in a case where the assignor held in good faith a treasury note of the United States which, it subsequently appeared, had been redeemed and canceled by the United States, but had been fraudulently purloined, the cancellation erased, and put in circulation. His assignee, after discovering these facts, sued him to recover the price, and this court awarded it.

Knight vs. Lanfear, 7 Rob. 172, the court said: "It is clear that the sale must be rescinded on account of the error of the plaintiff (and we believe defendant, also) as to the substance of the object of the sale. * * * If the character of the note and all

15

the circumstances attending its redemption, the purloining of it, and the conduct of the officers of the United States before and after the purloining had been disclosed to the plaintiff when he purchased the note, it is clear that he would not have bought. He wished to purchase, and believed he was purchasing an unadulterated treasury note, receivable in payment of duties, and salable at the market price—one which he could not be compelled to take back after he had sold it. He was in an error when he received the note which is the subject of the present suit. His error prevented his consent, and the absence of his consent deprived the sale of all its effects and consequences.''

The case of Otis vs. Cullom, 92 U. S. 447, which is relied upon as counter to the doctrines above enunciated, is clearly distinguishable and rests upon an entirely different principle, viz.: that ''the plaintiffs in error got exactly what they intended to buy and did buy.'' The facts showed that they bought bonds of the City of Topeka which had been issued under certain laws of the State of Kansas, which were subsequently decided to be unconstitutional and the bonds annulled. All the bonds issued under these laws stood in the same case; it was not a case where some were good and some bad. The plaintiff simply bought bonds issued under these laws, and he received bonds so issued and just as good as any other bonds so issued. He got what he bought and intended to buy, and could not complain, his information as to the matter being the same as that of his assignor.

But here the bonds sold are part of the consolidated bonds of the State of Louisiana, all of which are valid and binding obligations of the State, except those which have been annulled or redeemed. Obviously, the plaintiff here intended to buy good bonds—not worthless similitudes which had been extinguished by constitutional mandate or by valid redemption. She did not get what she bought, and her assignor can not keep the good money which he received for bad bonds.

The Supreme Court of Nebraska has, in a forcible opinion, shown the inapplicability of Otis vs. Cullom to cases like this. Rogers vs. Walsh, 12 Neb. 28.

Yielding the utmost force that can be claimed to the equitable considerations which might influence the State in assuming responsibility for wrongs inflicted on third persons by the fraudulent acts of

Pugh vs. Moore, Hyams & Co.

its own chosen officers, the stubborn fact remains that the existing government is not bound, and even lacks the power, to make any provision for the redemption of these bonds. This leaves the case within the inexorable grasp of the authority of the decision in Knight's case, where the court went much further than we can go in this case, and said: "We have considered the defence in the most favorable view in which it can be placed for the defendants. We have assumed, for the sake of argument, that the conduct of the officers of the the Treasury Department, of the customhouse and of the bank at which the interest was paid, has been such as to entitle the fair holder of the note to demand its amount from the United States;" but even on this hypothesis, the court said the purchaser did not buy "the chance of a successful application at Washington for the reimbursement of what he advanced. He wished to purchase, and he believed he was purchasing, an unadulterated treasury note, receivable in payment of duties at the customhouse, and salable at the market price, one which he could not be compelled to take back after he had sold it. He was in error when he received as such the note which is the object of the present suit. His error prevented his consent, and the absence of his consent deprived the sale of all its effects and consequences."

It is apparent that plaintiff intended to buy, and defendants to sell, untainted and unquestioned bonds of the State, the redemption of which in principle and interest is provided for in the existing Constitution and laws, not bonds which the government of the State as organized under that Constitution can not and will not provide for, and which can never be recognized or redeemed by any power short of an amendment of the Constitution.

For these reasons, as well as for those more elaborately stated in the principal opinion, I concur in the decree, and Justices McEnery and Breaux also concur in this opinion.

---

### DISSENTING OPINION.

WATKINS, J. It appears that on April 24, 1889, the plaintiff bought of defendants five bonds of the State of Louisiana, of $1000 each, for which she paid $4443.75; and, alleging her subsequent discovery of the fact that said bonds were not valid, and that the State

had refused to recognize them, she demands of the defendants resti-
tution of the price paid therefor.

The grounds of nullity assigned are, viz.:

1. That four of said bonds, those numbered respectively 742, 842,
866 and 883, which heretofore formed a part of the consolidated
bonds held by the State for the use and benefit of the Agricultural
and Mechanical College, were, by the 233d Article of the State Consti-
tution, declared to be null and void after the 1st day of January, 1880,
and for the payment of which the Legislature was, in terms, pro-
hibited from making any provisions, and that it, also, commanded
that same should be destroyed in such manner as the General Assem-
bly may direct.

2. That the bond numbered 5611, being one of the series of con-
solidated bonds which had been exchanged under Act 121 of 1880,
for constitutional bonds,—quoting from plaintiff's brief, p. 3—"*is
paid and extinguished.*"

Against this action three defences are set up, viz.:

1. That defendants acted as brokers, and are only liable for frauds
or faults, and are free from both.

2. That if the transaction was deemed a sale, it was of a specific
thing, and defendants delivered exactly what the plaintiff bought.

3. That the bonds in question are valid outstanding obligations of
the State.

I.

On the first proposition my opinion is in accord with that of the
majority of the court, for the reasons stated, that if the defendants
acted as brokers in the transaction, and sold the bonds to plaintiff
for other persons than themselves, their liability is that of vendors,
for the reason that they failed to disclose the fact of their having
acted in that capacity, or the names of their principals.

Brokers buy and sell on their own account, customarily, as well
as upon the account of others. If they sell on their own account
they ere evidently responsible; and, to avoid such responsibility,
they must show who their undisclosed principals are.

II.

On the second proposition I am also in accord with the majority
of the court—that is to say, if the transaction is to be viewed as one
of sale, or assignment, and therefore governed by the precepts of

the Civil Code, and not as a transfer of negotiable instruments, and, therefore, controlled by the principles of the law merchant. For, as vendors of bonds, as articles of merchandise, defendants are bound under the law of warranty to protect plaintiff, while as *bona fide* holders and transferrers of negotiable securities a different rule obtains. For, says the Supreme Court, speaking through Mr. Justice Swayne in Murray vs. Lardner, 2 Wall. 110: "The general rule of the common law is that, except by a sale in market overt, no one can give a better title to personal property than he has himself. The exemption from this principle of securities, transferrable by delivery, was established at an early period."

### III.

But on the third proposition I can not agree with the majority of the court. The proof is clear to the effect that the bonds in question are genuine consolidated bonds of the State of Louisiana, regularly and properly issued, under and in pursuance of the funding laws, and the corresponding constitutional amendment. That they were duly signed by the Governor, Auditor and Secretary of State, and the interest coupons thereto attached were signed by the State Treasurer and Auditor as required by the provisions of Sec. 3 of the funding act of 1874.

That they were apparently issued by the Board of Liquidation provided by Sec. 2 of that act, and were by said board regularly exchanged for "valid outstanding bonds of the State," and possessed, primarily, a good consideration.

That they were payable to bearer at forty years from the first of January, 1874, regularly numbered, and bear interest at the rate of 7 per cent., payable semi-annually.

That they composed and represented a part of the bonded debt of the State, the amount of which was fixed in the funding act of 1874 at $15,000,000, and which was intended to "constitute a systematized issue of bonds, having uniformity in date, maturity and form." Hope & Co. vs. Board of Liquidation, 43 An. 763.

These facts are not questioned by the opinion of the majority nor by counsel for the plaintiff, the theory of the latter being that said bonds *heretofore formed a part of the consolidated bonds of the State,* but for reasons assigned, as *subsequently* happening, same had ceased

to be  legal and  valid  obligations  of the  State.   It is this latter
proposition that the defendants deny.

In order  to  test the  validity  of said  bonds in the  hands of de-
fendants, as holders thereof, on the 24th  of  April,  1889,  the date
plaintiff purchased them,  the *status*  of the bonds, primarily, must be
ascertained and first determined.

For, on the foregoing state of facts, the defendants' contention is
that they were  *bona  fida*  holders of  the  negotiable  paper of  the
State of Louisiana, maturing at a date in the future, and are entitled
to the protection of the law merchant;  on  the theory  that a  State
like the United States, when she makes herself a party to negotiable
instruments, through her duly authorized officers, acting under con-
stitutional and statutory warrant, incurs all  the risks  and responsi-
bilities of an individual maker or indorser of such instruments under
like circumstances.

Whilst, on the  other  hand,  counsel for  the  plaintiff  admitting
"that as between holders of said  bonds  they  are governed, in  all
particulars, by the  jurisprudence  applicable  to  negotiable  instru-
ments," denies that " *as regards  the  State*, the  principles can be so
sweeping."   For, says he,  " to admit such a proposition would con-
cede the power of an  officer  charged with  the emission of  certain
State or municipal securities to  overwhelm the State or municipali-
ties with an unlimited and incontestable debt."

Therefore, the first question to be solved  in the effort to  test the
primary validity of the  bonds under  consideration, is  the capacity
and character of the State as maker thereof.

(aa)  Apparently  these  bonds are  invested with the fullest sanc-
tion that could  be given  to any  piece of  paper which a  sovereign
State *could* issue, and put upon the markets of the world.

They have the fullest  possible  sanction  of the Legislature  of the
State, as expressed in the funding statutes.

At the same session of the General Assembly whereat the funding
laws were enacted, a constitutional amendment was proposed which
declared, *inter alios*, that " the issue of consolidated bonds author-
ized by the General Assembly of the State, at  its regular  session in
1874, is hereby declared to *create a  valid  contract  between  the  State
and each and every holder  of  said bonds,  which  the  State shall by  no
means* impair;" and that " the said bonds shall  be  *valid  obligations*

*of the State, in favor of any holder thereof, and no court shall enjoin the payment of the principal or interest thereof,* or the levy and collection of the tax therefor," etc.   [Italics are mine.]   Act 3 of 1874, Acts p. 42.

This amendment was adopted as a part of the organic law prior to the date of the issuance of said consolidated bonds, and constituted and remained a part thereof until the 1st of January, 1880.

Hence the whole series of consolidated bonds was not only authorized by statute and constitutional amendment, but in said amendment the bonds are declared to be " *valid contracts* between the State and each and every holder thereof," and, also, " *valid obligations of the State in favor of any holder thereof.*"

It were, in my opinion, a vain effort to search out words of more evident and emphatic import with which to clothe a statutory or constitutional mandate authorizing certain designated State officers to bind the State to a solemn contract than are those I have just quoted from the funding statute and constitutional amendment.

Manifestly, it was upon the faith of these laws—statutory and constitutional—that the public creditors of the State accepted such consolidated bonds and gave in exchange therefor other warrants and obligations of the State.

Then what is the position the *State* occupies in such a contract toward its creditors and other persons who acquire possession of such paper in market overt?   An examination of the authorities will attest the truth of the rule to be, that the government of a State, like that of the United States, when she makes herself a party to negotiable paper, incurs all the risks and responsibilities of an individual maker or indorser of such instruments under like circumstances.

One author states the rule to be that "government bonds payable to bearer, or otherwise negotiable in form, are negotiable instruments, and may be transferred as such." 1 Randolph on Commercial Ins., p. 449, Sec. 348.

"The government of the United States, it has been held, may, by its authorized officers, become a party to negotiable paper *with all the rights and liabilities of an individual, except the liability to be sued.*" Id., Sec. 350.

Another states it thus:

"Except in so far as the power of the government may be restricted by constitutional limitations, there can be no doubt that both the *State* and Federal governments may, by their duly authorized agents, become parties to *any species of commercial paper.*" Tiedeman on Commercial Paper, p. 129, Sec. 132.

Another author puts it thus:

"There is no doubt that when an officer of the government, Federal or *State*, who is authorized to bind the government as drawer, maker or acceptor of a negotiable instrument, draws or accepts a bill, or makes a note in behalf of the United States, or the *State* which he represents, its validity can not be questioned when it has passed into the hands of a *bona fide* holder for value, without notice of any defect.

"The government would then be bound by its negotiable paper, *just as an individual would.*" 1 Daniel on Negotiable Instruments, p. 330, Sec. 436.

The foregoing opinions of text writers are founded, in the main, on the authority of United States vs. Bank of Metropolis, 15 Peters, 377; and Floyd Acceptances, 7 Wallace, 666.

And, in my opinion, I can not do better than quote a single paragraph from the *former* case, as presenting in the clearest light the view entertained by the Supreme Court on the question.

They say:

"When the United States, by its authorized officer, becomes a party to negotiable paper, they have all the *rights* and incur all the *responsibility* of *individuals* who are parties to such instruments. We know of no difference except that the United States can not be sued. But, if the United States *sue*, and a defendant holds its negotiable paper, the amount of it may be claimed as a credit, if, after being presented, it has been disallowed by the accounting officers of the treasury; and if the liability of the United States upon it be not discharged by some of those causes which discharge a party to commercial paper, it should be allowed by a jury as a credit against the debt claimed by the United States." 1 Story, 464; United States vs. Dunn, 6 Peters, 57; United States vs. Barker, 12 Whea. 561.

And one selected from the latter case puts the governing rule in even a stronger light, for in that case the court, speaking through Mr. Justice Miller, said:

"It must be taken as settled that when the United States becomes a party to what is called commercial paper—by which is meant that class of paper which is transferrable by endorsement or delivery, and between private parties, is exempt in the hands of innocent holders from inquiry into the circumstances under which it was put in circulation—they are bound in any court to whose jurisdiction they submit by the *same principles that govern individuals in their relations to such paper.*"

[Italics are mine.]

Those two cases involved time drafts, or bills of exchange drawn —one by a contractor for army supplies, on and accepted by the Secretary of War, and the other by a mail contractor, on and accepted by the Postmaster General—and in possession of third holders for value before maturity. But in Vermyle & Co. vs. Adams Express Company, 21 Wallace, 138, the court dealt with United States treasury notes, and in the course of its opinion, said:

"We can not agree with the counsel for the appellants, that the simple fact that they were the obligations of the government takes them out of the rule which subjects the purchaser of overdue paper to an inquiry into the circumstances under which it was made, as regards the rights of antecedent holders," thus reaffirming the same doctrine as that announced previously.

This principle has been announced in many recent cases, and notably Murray vs. Charleston, 96 U. S. 432, in which the court employed this emphatic language, viz.:

"The truth is, States and cities, when they may borrow money and contract to repay it with interest, are not acting as sovereignties. They come down to the level of ordinary individuals. Their contracts have the same meaning as that of similar contracts between private persons. Hence, instead of there being in the undertaking of a State or city to pay, a reservation of a *sovereign right to withhold payment*, the contract *should be regarded as an assurance that such a right will not be exercised.* A promise to pay, with a reserved right to *deny, or change the effect of the promise, is an absurdity.*"

In Louisiana vs. Jumel, 107 U. S. 711, the Supreme Court, in speaking of the identical issue of consolidated bonds we are now considering, said:

" Whatever may be, ordinarily, the effect of a promise or a pledge of faith by a State, the language employed in this instance shows, unmistakably, a design to make these promises and these pledges so far contracts that their obligation would be protected by the Constitution of the United States against impairment."

I have gone into this question very thoroughly on account of its overshadowing importance, in my opinion, in this case; and, in so doing, I have confined myself to the views of text writers and opinions of the Supreme Court, not because I was dealing with a federal question, but because I regarded them as the best exposition of the law merchant with respect to negotiable securities of the governments of the United States and of the States.

Having, as I confidently submit, made a demonstration of the proposition that prefaces this paragraph—that is to say that, in the execution of negotiable instruments payable at a future date, governments come down to the level of ordinary persons and incur all the responsibilities of individuals who are parties to such instruments, while possessing all of their rights—I will next address myself to the charges of nullity and illegality which the plaintiff assigns as the ground she relies upon for recovery of defendants; and, at the risk of being tedious, I will re-state the case as presented by the pleadings, and then analyze the evidence that is furnished us in the transcript, of the nullity and illegality of the bonds in suit.

We will first examine the case as applicable to the four bonds which are denominated Agricultural and Mechanical College bonds, of $1000 each.

(bb) The plaintiff alleges that she purchased of the defendants, as brokers in bonds, doing business as such in the city of New Orleans, twenty bonds of the denomination of $1000 each, "known commonly as 4 per cent. bonds of the State of Louisiana," with interest coupons attached, and for which she paid 88⅝ cents on the dollar, that being the price therefor at that date.

That said bonds have since remained in her possession and " she has discovered only recently that four of said bonds, numbered respectively 742, 842, 866 and 883, are not legal bonds of the State of

Pugh vs. Moore, Hyams & Co.

Louisiana; that they have never been lawfully issued; that they were not, at the time of said *sale*, and have never since been valid and legal obligations of the said State; and that they are a part of the consolidated bonds which were formerly held by the Treasurer of the State of Louisiana for the use of the Agricultural and Mechanical College fund, and that said bonds were declared by the 233d Article of the Constitution of Louisiana to be *null and void after the first day of January, 1880,* and that the General Assembly of Louisiana was prohibited by said article from ever providing for the payment of said bonds."

In addition, her petition contains the distinct admission that she collected the interest coupons on said bonds maturing on the 1st of July, 1889, subsequent to her acquisition of them from defendants, and avers that she presented these coupons maturing on the 1st of January, 1890, to the fiscal agent for payment, but payment thereof was refused.

It thus appears that plaintiff's charges are founded exclusively upon the nullity resulting from the declaration of the Constitution and not upon any specific charge of fraud upon the part of any officer of the State government, or upon any averment of embezzlement or theft of said bonds from the custody of any State fiduciary or depository.

There is no averment that defendants acquired said bonds or any one of them *mala fide*, or with knowledge of the alleged nullities, other than such as may have been conveyed to them by the said constitutional provision.

Defendants' answer alleges that they are and have been large dealers, as broker or otherwise, in the bonds of the State of Louisiana, which are negotiable securities, not yet due; are customarily bought and sold in open market, here and elsewhere, and as such, they pass daily from hand to hand without other warranty than that the signatures thereto are genuine.

They aver that these bonds are such negotiable instruments as were put in circulation by and through the duly appointed officers of the State for value and that in their hands same are and were good and valid obligations of the State, and unimpeachable as to all equities existing between the State and her officers, and consequently plaintiff is without any right of complaint.

Now, what is the evidence furnished by the transcript on the issues thus presented?

Taking the facts chronologically, I find the following, viz.:

(*a*) That on the 30th of November, 1874, there were presented to the Board of Liquidation 327 Agricultural and Mechanical College bonds, of $1000 each, for exchange in consolidated bonds, under and in conformity with the provisions of the funding act of 1874.

(*b*) That up to and inclusive of the date March 11, 1889, the following is the exact status of the bonded indebtedness of the State of Louisiana, viz.:

Whole amount of *consolidated*.......................... .......... .............. ..... ......... $12,110,500
Less constitutional bonds ................................................................. 290,200

Difference........ .............. .... ............................. .... ......................... ..$11,820,300

And that of that amount there had been issued consolidated bonds of the denomination of $1000, bonds numbered from 1 to 10,000. To this effect was the report of the present State Treasurer to the Secretary of the New York Stock Exchange on the date specified.

(*c*) A like statement is contained in the Auditor's report for the years 1888 and 1889, from which is deducted the sum of $196,200, as representing Agricultural and Mechanical College bonds.

(*d*) The official report of the Treasurer made for the year 1879 shows that there were, in *general terms*, on hand at that date, viz.: "One hundred and ninety-six bonds of $1000 each, issued by the State of Louisiana under Act 3 of 1874, numbered 710 to 905 inclusive; two bonds of $100 each. * * * Total held for account of Agricultural and Mechanical College, $196,200."

(*e*) The present Auditor and Treasurer—the former having been the incumbent for eight or ten years consecutively—state, as witnesses, that they "have never seen any of these bonds until recently," and that all of their knowledge in that respect is "derived from official documents."

(*f*) The Treasurer states that the interest coupons upon the bonds in question, maturing on the 1st of July, 1888, and the 1st of January, 1889, were paid by the banks in New Orleans that were acting as fiscal agents of the State; and the plaintiff's agent states, as a witness, that he collected the interest coupons falling due on the 1st of July, 1889, but that those falling due on the 1st of January, 1890, were refused payment.

(g) The Treasurer states that he has in his office no evidence of his predecessor having made any report under act 121 of 1880, in reference to the surrender of consolidated bonds.

(h) Whilst there was a joint committee of the General Assembly of 1880 appointed, and which, *in a general way*, represented in its report that the A. and M. College bonds, *inter alios*, were on hand, and recommended the appointment of a committee with authority to destroy them, this appears never to have been done. House Journal of 1880, p. 472.

(i) Another joint committee of the General Assembly of 1882 adopted a resolution, authorizing the Auditor and Treasurer to destroy the bonds referred to in the resolution of 1880, but no action seems to have been taken under it. Resolution of 1882, No. 127.

(j) Up to July, 1888, all the coupons carried by the banks, as stated in paragraph *f*, were subsequently destroyed by a joint committee of the General Assembly.

(k) On the 20th of September, 1889, the said Treasurer sent to the Secretary of the New York Stock Exchange a communication, stating that " the following consolidated bonds of the State of Louisiana were declared null and void after the first day of January, 1880, by Art. 233 of the Constitution of 1879, viz.: College and seminary funds, 196 bonds of $1000 each, Nos. 710 to 905." But he failed to state that said bonds were on hand, and then concludes his letter thus, viz.:

"The foregoing bonds are null and void, and as coupons of some of them have been presented for payment, it would appear that (some of the) bonds were on the market."

(l) On the 7th of September, 1890, previously, the Audtior had given formal notice to the Treasurer, and to the fiscal agents of the State, of suspicions he entertained in reference to these bonds of the A. and M. College.

(m) Contemporaneously an investigation was put on foot by the Auditor and Treasurer, which disclosed that a number of interest coupons corresponding with these bonds had been paid by the banks.

(n) At page 16 of the joint report, made by said officers, I find the following, viz.:

"Only since the adoption of the report of the joint committee, appointed under concurrent resolution No. 5, of 1888, have coupons, paid by the State's agents in London, New York and New

Orleans, been turned over to the Auditor for cancellation, *and it was when entering these coupons, taken up between January 22 and July 30 last (1889), that numbers corresponding with the numbers of several of said bonds on the coupon books, which were marked canceled, were found.* [Italics are mine.]

. "A further investigation disclosed the fact that these coupons are not counterfeit, but coupons clipped from bonds which were supposed to have been destroyed as required by Act 121 of 1880, and concurrent resolution 127 of 1882."

(*o*) The Treasurer in answer to a further communication from the secretary of the New York Stock Exchange, making inquiry " as to the *days and dates* when the information contained in his previous letter was *promulgated, designating the numbers of bonds* which were declared null and void," stated on the 29th of October, 1889, that " the information had been previously published in the New Orleans daily papers, and had been obtained from the banks which represent the State in the payment of the current coupons. The official report of the Governor of the State, which was published on the 29th ultimo, and copied in the daily papers, was the *first official publication of the numbers of the illegal issue of bonds.*" [Italics are mine.]

(*p*) The purchasing agent of the plaintiff, as witness, states that he collected the interest coupons on July 1, 1889, "previous to any suspicions about the invalidity of the bonds," adding that his first intimation as to their invalidity was in August or September, 1889, and that it was obtained from the newspapers.

(*q*) One of the defendants' firm states, as a witness, thatthe first intimation he had of any of the bonds his firm had been dealing in being fraudulent was in September, 1889, while he was in New York, and that " up to that time they had passed unquestioned, from hand to hand, and that same had been dealt with by the Stock Exchange like bank notes. They looked at the signatures, and if they were all right the bond passed."

Both Moore and Wheeler, circumstantially, state that the defendants *purchased* said bonds on the *same day and date on which they sold same to the plaintiff.*

This analysis of the evidence clearly and indisputably demonstrates that there is no proof of any *particular fraud* or act of *embezzlement* on the part of *any one*, in the emission of the four consolidated bonds in question, either alleged or proved.

A comparison of these four bonds made with bond 5611, which is not alleged to be one of the series of Agricultural and Mechanical College bonds, will show them *all* to be of *identically* the same tenor and physical appearance, the four possessing no *insignia* of their being specially dedicated to said college fund. They are parts and parcels of the whole systematized series of the State's consolidated debt of $11,820,300. Aside from the report of the Treasurer in 1879, there is no evidence *tending* to show that the $196,000 of Agricultural and Mechanical bonds were at any time physically in the possession of the State Treasurer since they were issued by the Board of Liquidation, in November, 1874; though the proof is abundant that they have been extant since 1880. The fact that they were not destroyed by the officers designated by legislative committees of 1880 and 1882 —the bonds being *in the original before the court and in no manner defaced*—definitely suggests their *absence* from the treasury *then.* That same have been in circulation is evidenced by the payment of interest coupons by the State's fiscal agents, even to the plaintiff herself.

Since the passage of the act of 1888 all interest coupons have been destroyed by the legislative committees, apparently without examination or question.

Not until the 20th of September, 1889—subsequently to the plaintiff's purchase—was official notification furnished by the Treasurer to the New York Stock Exchange that the $196,000 of Agricultural and Mechanical College bonds of $1000 each, bearing the numbers 710 to 905, had been declared null by the terms of the Constitution of 1879. Not until the 7th of September, 1889, did the Treasurer himself and the fiscal agents receive any notification of their supposed illegality.

It was only by *careful scrutiny* of the coupon book, and a comparison of the numbers of the coupons thereon registered as canceled, with the numbers of the bonds in circulation, that the Auditor *made the discovery at all, and the fraudulent bonds were identified by their numbers.*

The Treasurer officially states to the New York Stock Exchange, over his signature, under date October 29, 1889, that the "*first official* publication of *the numbers of the illegal issue of bonds*" was made to the Governor on the 29th of September, 1889.

The proof is clear that at the date of the defendants' acquisition of these bonds and their sale to the plaintiffs—and antecedent to that time—that neither party to this suit entertained the slightest suspicion of them; that they passed from hand to hand in market without question; and had been theretofore dealt with by the Stock Exchange in New Orleans like bank bills.

The following is an extract from the 233d Article of the Constitution of 1879, which is relied upon as annulling the Agricultural and Mechanical College bonds, viz.:

"The debt due by the State to [the *Agricultural and Mechanical College* fund is hereby declared to be the sum of $182,313.03, being the proceeds of the sales of lands and land scrip heretofore granted by the United States to this State for the use of a college for the benefit of agriculture and the mechanic arts; said amounts shall be placed to the credit of said fund on the books of the Auditor and Treasurer of the State as a perpetual loan, and the State shall pay an annual interest of five per cent. on said amount from January 1, 1880, for the use of said Agricultural and Mechanical College; the consolidated bonds of the State now held by the State for the use of said fund shall be null and void after the first day of January, 1880, and the General Assembly shall never make any provision for their payment, and they shall be destroyed in such manner as the General Assembly may direct."

Let me for a moment consider this constitutional mandate in reference to the bonds in question and see what it is.

1. It fixes the amount of the debt of the State at $182,313.03, and directs that that sum shall be placed to the credit of A. and M. College fund on the books of the Auditor and Treasurer of the State as a perpetual loan at interest.

2. It declares that "the consolidated bonds of the State now held by the State for the use of said fund" *shall be null and void after the 1st of January, 1880.*"

3. It declares that "the General Assembly shall never make any provision for their payment."

4. It further declares that said bonds "*shall be destroyed in such manner as the General Assembly may direct.*"

The first thing that strikes my mind is, that there is a marked inconsistency between the 1879 report of the State Treasurer, that is so much relied upon, and the article of the Constitution, in that the

Constitution fixes the debt of the State to the A. and M. College fund at a little over $182,000, whereas the Treasurer's report fixes the amount of the Agricultural and Mechanical College bonds at $196,- 000, the amount of the bonds exceeding the amount of the debt recognized by $14,000

What has become of this surplus of bonds which did not come within the reach of the constitutional fiat?

Who is to venture the assertion, *ex gratia*—for there is no evidence on that subject in the transcript—that the bonds in suit are not of that surplus?

Keeping in mind that in the Treasurer's official announcement to the Secretary of the New York Stock Exchange on that 29th of October, 1889, several months *subsequent* to the *defendants'* acquisition of their bonds in open market, that "the first *official publication of the numbers of the illegal issue of bonds*" was made to the Governor of the State on the 29th of September, 1889, and how can it be possible for any one to have known, in anticipation of that event, that these bonds did not form a part of the *surplus* of $14,000, even conceding for the argument that the remaining $182,- 000 were annulled?

In the second place, as the article in question treats them as "the consolidated bonds of the State," and only declares that they "shall be null and void *after* the 1st of January, 1880," they were admittedly and necessarily valid *antecedent to that date.*

And if they went into circulation *while* esteemed to be valid by the terms of the Constitution—and nothing is shown to the contrary —any attempt to annul them, in the hands of innocent third persons, would justly be considered an attempted impairment of a protected contract. Louisiana vs. Jumel, 107 U. S. 711.

In the next place, it is perfectly plain that the General Assembly has failed to carry out the constitutional mandate to *destroy* said bonds, and left it in the power of others to put them into circulation and thus practice a fraud upon the State. For one of two propositions is clear. (1) The bonds were *not* in the State Treasury in 1880 or subsequently, and, therefore, unaffected by the article of the Constitution; or (2) *if they were*, the General Assembly was at fault in not having caused them to be *destroyed*, and thus put out of the reach of the thief and embezzler.

In the last place, it is also plain that the failure of the General

Assembly to cause these bonds to be destroyed has resulted in the payment of their interest coupons, during the years since 1880, and thus accomplishing, by *indirect* means, a violation of the constitutional prohibition, that " the General Assembly shall never make any provision for their payment," as well as to induce the commercial world to put its trust in them as *valid* State securities, relying on the *knowledge* and *good faith* of the State's fiscal agents in paying the coupons.

And just here a question arises as to the effect the public records and other official *data* hereinbefore mentioned has, as matter of law, upon dealers in such public securities, and I will *en passant* express my views upon it. My belief and deliberate conviction are that they do not affect them with any notice at all.

Mr. Daniels states the rule thus:

" Parties negotiating for negotiable instruments are not bound to take notice of *public records* and litigation *which would affect them with notice, were they dealing with the subject matter*. And, therefore, when there is *nothing* on the face of the bill or note, *giving notice of any defects*, the fact that the deed of trust securing its payment contains recitals which show the equities on offsets existing between the *original* parties does not weaken the position of a *bona fide* holder without notice." Daniels on Negotiable Instruments, Sec. 880.

This doctrine has been accepted and approved by this court in Morris vs. Cain, 39th of Annuals, at pages 731 and 732. In a previous case this court also took occasion to announce the same principle in a different form of expression, thus:

" Had the note been *paraphed* to identify it with the act of pledge, the defendant might, perhaps, have charged that the pledgee was thereby *put on his guard*—notified of the declaration contained in the act of sale, and bound thereby, etc. * * * What he was *bound to know* was what he could have known, and, in point of fact, did know." Schepp vs. Smith, 35 An. 3.

These are matters a purchaser of negotiable instruments is *not bound to know* as they appertain to matters *dehors* the instruments themselves, arising *subsequent to their execution and issuance* by competent authority.

(cc) I will now retrace my steps and take up the consideration of bond No. 5611. The Treasurer and Auditor state, as witnesses, that

there are no reports or other evidences in either of their offices of the surrender of any consolidated bonds in exchange for constitutional bonds under and in pursuance of Act 121 of 1880, and consequently there is none in reference to this particular bond 5611, against which the plaintiff brings the charge of nullity because of its surrender, under the provisions of the debt ordinance.  There is, however, some parol testimony tending to show that this bond was surrendered for exchange on the 6th of July, 1883.  In the communications of the Treasurer to the New York Stock Exchange, in 1889, it is stated that there were twenty-one consolidated bonds, of the denomination of $1000 each, surrendered for exchange in constitutionals, under Act 121 of 1880, and among the numbers furnished is that of 5611; and then it is announced that they are null and void.

But there is no proof that any legislative or other proceeding was undertaken *subsequent* to the date specified, *looking* to the destruction of such surrendered bonds as the statute required.

Then it is perfectly clear that this bond must be treated, in this discussion, just as it was evidently dealt with in market, as a *valid* consolidated bond, appearing, as it does here, in the *original*, without a mark or blemish of any kind upon it, and possessing all apparent *indicia* of a negotiable State security not yet due.

This bond does not come under the nullifying ban of the Constitution.

Therefore, all five of the bonds in suit (or under consideration in this suit, to speak more accurately) may be put on the same basis and disposed of similarly.

(dd)  What are the defences that can be *successfully* urged against negotiable State securities, in the hands of an innocent holder for value before maturity?  That is the precise question we have confronting us here.

The general rule as formulated by Mr. Daniels, in reference to individuals, is as follows, to-wit:

" By *purchaser* or *holder* of a negotiable instrument is intended any one who has acquired it in good faith, for a valuable consideration, from one capable of transferring it  *  *  *  in the ordinary course of business  *  *  without notice of facts which impeach its validity as between antecedent parties."

Such a holder possesses a title " unaffected by those facts, and

may recover on the instrument, although it may be without *any legal validity as between antecedent parties; as*, for example, even though it was *originally obtained by fraud, theft or robbery.*" 1 Daniels on Negotiable Instruments, p. 556, Sec. 769.

He extends that doctrine still further and says:

" It is to be observed, as a general rule, the purchaser can never be placed on a worse footing than his transferror, although he himself could not, in the first instance, have acquired the vantage ground occupied by such transferror. And, therefore, even if he have notice that there was *fraud* in the inception of the paper, or that it was *lost* or *stolen*, or that the consideration had failed, between some antecedent parties, or the paper be overdue and dishonored, he is, nevertheless, entitled to recover, *provided his immediate vendor was a bona fide holder for value, unaffected by any of these defences.*" Id. 803.

That principle was announced upon the authority of numerous adjudicated cases by the highest courts in many States, our own amongst the number, and of the Supreme Court in Commissioners vs. Clark, 94 U. S. 285.

That section was quoted from Daniels, with approval, in Levy vs. Ford, 41 An. 870, and upon the correctness of that principle I feel that I may rest with confidence.

Thus it is that the possessor of a negotiable intstrument by *such* a holder carries with it a title that is fully protected against charge of *fraud*, or *theft*, or *failure of consideration*, between antecedent parties, and that rule of property in such paper is so strong that such holder can convey to another a valid and indefeasible title, although the latter *knew* of its inherent defects.

Not only so, but any one charging *mala fides* in such holder has the burden of proving it put upon him. Id., Sec. 769.

Having announced the general rule as above the author then proceeds to deal with other grounds of defence, and says:

"That *suspicion* of defect of title, or knowledge of circumstances which would excite suspicion in the mind of a prudent man, or gross negligence on the part of the taker at the time of the transfer, will not defeat his title   *   *   subject to the following modifications or qualifications, viz.:

" 1. That when it is *shown* by the defendant that the instrument *originated* in fraud or illegality, the burden of proof will be shifted

to the holder, and he must then prove that he is a *bona fide* holder for value.

"2. Where it is *shown* that the instrument was *given* for a consideration which, by statute, is declared void, the *original taint* follows it, and it is void in the hands of *every holder, however innocent.* And that *no party* can enforce a negotiable instrument, if it be *not genuine*, or if it be *executed* by a party *incapable of entering into the contract in which it was given.*" [Italics are mine.] Id., p. 557, Secs. 769, 806.

Then he generalizes the principle, and says:

"But the rule of the text is, we think, in conformity with the current and weight of authority, and the law merchant. The fraud which shifts the burden of proof must be in the *consideration*, or representations used in obtaining the *execution* of the instrument, and *not in the after breach of trust in diverting it from the uses for which it was intended.*" Id., p. 596, Sec. 792.

This precise distinction has been taken, substantially, in many cases decided by our predecessors. Oliver vs. Andry, 7 La. 498; Dick vs. Leverich, 11 La. 576; Jackson vs. Commercial Bank, 2 R. 138; Bank vs. Bank, 16 La. 457; Labadie vs. Association, 4 R. 190; Babbit vs. Hewitt, 11 An. 327.

It finds complete sanction in the recent jurisprudence of the Supreme Court, as attested by the following cases: Murray vs. Lardner, 2 Wall. 110; Orleans vs. Platt, 99 U. S. 676; Shaw vs. Railroad Co., 101 U. S. 557; Collins vs. Gilbert, 94 U. S. 753; Cromwell vs. County of Sac, 96 U. S. 59, and numerous other decisions.

Mr. Randolph, in his treatise on Commercial Instruments, says:

"In order to constitute a valid security, any bond or negotiable obligation of the *State* must be *issued* on authority of the Constitution and statute law." 1 Randolph, Com. Ins., p. 494, Sec. 348.

And he lays down the general proposition that the powers and duties of officers and agents " of the government, whether Federal or State, are defined by statute, which is notice to the world of the limitations to their authority. Id., Sec. 440.

The same author states the rule with regard to the negotiable instruments of a municipal corporation thus:

"It may be laid down as a general principle that debts *unlawfully contracted* by a municipal corporation are not binding upon it.

" So, a municipal bond *issued without authority* is invalid, although it be negotiable in form.

"And the defence of *original want of authority to issue the bond* is available against all holders." 1 Randolph Com. Ins., p. 488, Sec. 343.

Mr. Dillon, in treating of the same question, says:

" And it is a general and fundamental principal that all persons contracting with a municipal corporation must, at their peril, enquire into the *power* of the corporation and its officers to make the contract, and a contract *beyond the scope of the corporate* power is void, although it be under the seal of the corporation." 1 Dillon Mun. Corp., Secs. 372, 381.

Against such a contract the plea of *ultra vires* may be successfully interposed. Id., Sec. 381.

" In favor of *bona fide* holders of negotiable instruments, the corporation may be estopped to avail itself of *irregularities* in the *execution* of the power conferred; but it may always show that, under no circumstances, could the corporation *lawfully make* a contract of the character in question." Id., Secs. 381, 416.

After announcing the foregoing rule, the author proceeds to state what I conceive to be the proper line of demarcation that is to be drawn between the authenticity of State and municipal bonds, in respect to the protection of the holder against latent equities—that is, as to *where* the power *does* exist—there being embarrassments and difficulties, in respect to the *evidence* of compliance on the part of the officers of a municipal corporation, that do not exist in respect to the acts of the officers of State.

He says:

" Such a power is frequently conferred to be exercised in a *special manner*, or subject to certain *restrictions, conditions* and *modifications;* but if it appears that the bonds show by their *recitals* that the *power was exercised in the manner* required by the Legislature, and that the bonds were *issued* in conformity with those *regulations*, and pursuant to those *conditions and qualifications*, proof of non-compliance with same will be unavailing to the corporation."

Citing as the leading authority on the question, Commissioners of Knox County vs. Aspinwall, 21 Howard, 539, the author then proceeds as follows, viz.:

" Obviously, then, the most important inquiries to be considered

are those which relate to the question *when the power exists or arises; who* is to decide whether it existed or had arisen when the bonds were issued; and *what* will estop the corporation which issued them to set up in defence a *non-compliance with antecedent* or *preliminary conditions.*" Id., Sec. 410.

This was, in my opinion, necessary to be observed, because of what I deem to be the inapplicability of very many decisions that are cited in reference to defences urged against municipal bonds in the hands of third holders.

In respect to State bonds no such embarrassment exists, inasmuch as the *law* authorizing the issuance of bonds is an exercise of *sovereignty* only restricted by constitutional limitation; and to ascertain the authenticity of their issuance, a simple inspection of the act will ordinarily suffice.

Having examined the enabling statute and the constitutional authority for its enactment, a mere casual inspection of the State bond will readily disclose compliance therewith on the part of the officers entrusted with the duty of its confection—and nothing further is necessary to make it available as a negotiable security.

And just here I deem it important to note what I conceive to be the inapplicability of Otis vs. Cullom, 92 U. S. 447; Orleans vs. Platt, 99 U. S. 676, and Ætna Life Insurance Company vs. Middleport, 124 U. S. 545, to the case at bar, and it is this: Those cases proceed on the theory that, admitting the *illegality* of the bonds in their *inception*, the last taker has no recourse against his predecessor under the principles of subrogation in equity founded on the civil law, while this case proceeds on the theory that bonds having a *valid original existence*, having been fraudulently dealt with since, the State is relieved.

So, in the instant case, as there was manifestly no want of authority to *issue* the bonds in question, and no question of the authority of the Board of Liquidation to issue them, the defences set up against them are clearly unavailing. No *after breach of trust* in diverting the bonds, once regularly issued and put in circulation, from the uses for which they were intended can affect their validity in the hands of innocent holders.

In Cooke vs. United States, 91 U. S. 389, the question was the right of the United States to recover of Jay Cooke & Co. the money paid to them by the Assistant Treasurer in redemption or purchase, *before*

*maturity,* "of," as stated by the court, "what purported to be eighteen 7-30 treasury notes, issued under the authority of the act of August 12, 1863, but which, it is alleged, were counterfeit."

The defence was that Cooke & Co. honestly believed them to be genuine, "and so believing, in good faith received and paid for them, and there can be no recovery, even though they may have been counterfeit;" and the court held as the notes were ascertained to be genuine, *though unlawfully* and *surreptitiously put in circulation,* the government was bound for their payment to a *bona fide* holder, and consequently there could be no recovery in that case. [Italics are mine.]

That decision proceeded upon the theory that the notes were *perfect and complete, and in no manner canceled or defaced,* just such as the instruments we have here.

But in District of Columbia vs. Cornell, 130 U. S. 655, the court, while recognizing the doctrine of the Cooke case, stated that they were not "*prepared to extend the scope of that decision.*"

The facts of that case were very different from those of the Cooke case, as it appears from the opinion of the court that "the certificates in suit, after they had been redeemed according to law, were canceled by the proper officers by *distinctly stamping* in ink across the face words stating that fact," etc.

Had the State of Louisiana caused the same, or any similar acts, to have been done as directed by the article of her Constitution, I should certainly not find occasion to express this dissent.

Strong reliance is placed by counsel of plaintiff, as well as in the opinion of the court in Moffatt vs. United States, 112 U. S. 24, as stating a doctrine altogether at variance with that of the Cooke case.

In this I entertain a different opinion also from that of the majority. In the execution and issuance of treasury notes, as commercial instruments, the United States made herself a party thereto as an *individual,* and not as a sovereign. But in the Moffatt case her relations with the register and receiver of the United States land office were strictly *governmental.*

The case cited was one instituted by the United States for the cancellation and revocation of two patents for land, granted under the pre-emption laws of Congress, and it proceeded upon the theory that the persons named as patentees were fictitious, and that no

settlement or improvement had been made on the land, which was, under the law, a condition precedent.

The only question in that case was that of the binding force and efficacy of the *acts* of those public officials upon the government, while in the discharge of the *general duties* of their offices, and not with regard to third persons, who had acquired, under exceptional circumstances, rights protected by apparent *bona fides* of such public officers under the law merchant.

In my opinion, the government does not undertake to become responsible for the consequences of the non-feasances, and misfeasance of her agents and officers toward third persons who may deal with them. On that question the court said in reference to the fraudulent and illegal acts of the register and receiver in issuing the patent certificates in question, viz. :

"The government does not guarantee the integrity of its officers, nor the validity of their acts.   *   *   They are but the servants of the *law*, and if they depart from its requirements the government is not bound. There would be a wild license to crime if their acts in disregard of the law be upheld to protect third parties, as though performed in compliance with it."

But to show conclusively that that decision was not intended to affect the question here, it is only necessary for me to cite the concluding portion of the opinion in that case, viz. :

"There is, in such cases, no room for the application of the doctrine that a subsequent *bona fide* purchaser is protected, etc.   *   * To the application of this doctrine of a *bona fide* purchaser, there must be a genuine instrument having a legal existence as well as *one appearing on its face to pass the title*. It can not arise on a *forged* instrument or one executed to *fictitious* parties, that is to no parties at all, however much deceived thereby the purchaser may be. Even in the case of negotiable instruments where the doctrine is carried furthest, for the protection of subsequent parties acquiring title to the paper, it can not be invoked, if the instrument is *not genuine*, or if it is executed *without authority* from the supposed maker." Floyd's Acceptances and other cases.

(ee) The final question on which I deem it necessary to present my views is in regard to the applicability of the cases of the Sun Mutual Insurance Company vs. Board of Liquidation, 31 An. 175, and State ex rel. Durant vs. Board, 29 An. 77. While I concede the

similarity of the questions discussed in those cases to the one under consideration here, and also concede the correctness of the principles therein announced, yet, in my view, they are inapplicable to this case. Those were suits against the State, and creditors of the State, therein appearing as plaintiffs, and submitting themselves to the operation of the funding statutes, demanding the right to surrender obligations of the State in exchange for consolidated bonds, are conclusively presumed, and must be held bound to have accepted the *grace* of those statutes as it was extended to them, coupled with the right of the State to question the validity of the tendered obligations under the terms of those laws. Hope & Co. vs. Board of Liquidation, 43 An. 763; State ex rel. Hope & Co. vs Board, 42 An. 851; State ex rel. Newman vs. Board, 39 An. 395; State ex rel. New York Guaranty Co. vs. Board of Liquidation, 38 An. 337.

In another recent case we said:

" The State has given permission for a certain class of obligations to be presented by the holders of them to Louisiana courts for determination as to their validity; and, in authorizing suit against herself, she has pointed out the channel through which it must reach the courts, and it must be followed." Hope & Co. vs. Board of Liquidation, 41 An. 535.

In Lord Cecil vs. Board of Liquidation, 30 An. 435, a suit similar in all respects to those cited, certain bonds of the State were denied the right of exchange under the amended funding statute of 1875, on the grounds that same had been in terms declared by that statute of doubtful validity; hence, under the terms thereof, the board was without *power* to fund them into consolidated bonds until they had been first declared " to be legal and valid obligations of the State" by this court. Acts of 1875, p. 110.

Of the issue thus presented this court very correctly expressed the following opinion, viz.:

" Of what avail is an inquiry touching the validity of a bond, or its issuance in conformity to law, if the fact that it was not issued in conformity to law will not affect the right of the holder? Clearly, this rule of commercial law *does not apply here.* The State can be sued in her own courts *only* by her permission, and in the manner and for the purposes indicated by her. The supplemental funding act required parties, who resort to an action *against* the State through a board of liquidation, to establish the good consideration

and valid issue, in conformity to law, of the bonds offered for funding, and restricted this court to an ascertainment of these requisites by those bonds. It is *that law*, therefore, that must be our guide, and *not the general commercial law in actions like the present.*"

This is no such a case as that one was. The bonds which were surrendered to the Board of Liquidation in exchange for the consolidated bonds in controversy were of unquestioned validity, being State bonds which were held in trust for the public school funds. The exchange was made *without suit* against the Board of Liquidation, and in the month of November, 1874, *prior* to the enactment of the supplemental funding act of 1875, under which the Durant and the Sun Mutual Insurance Company cases were brought and decided.

Under no circumstances can those cases be accepted as authorities controlling *this* case. And it would be clearly a *non sequiter* to argue from that jurisprudence as a premise that after the Board of Liquidation had acted on the claims of creditors and issued consolidated bonds, and they had gone into free and unrestrained circulation in the channels of commerce, that the State can, by an exercise of *sovereign power*, destroy the negotiability of those obligations to which she had voluntarily, and for adequate consideration, made herself a party as *an individual debtor*.

It will not do for this court to say that the State is only bound for such bonds as were *physically and actually put into circulation by some* " *authorized officer of the government in pursuance of law.*" The Supreme Court say, in the Cooke case, " this we think is too narrow a construction of the act." For they say, " in this (the treasury) department the Secretary represents the government. His *acts and his omissions*, within the line of his official duties, are the *acts* and omissions of the government itself; and *in all commercial transactions his negligence will be deemed to be the negligence of the government.*" Pp. 401, 404.

It appears to me that from every point of view that case is in exact parallel to the instant one, and, taking, as I have before remarked, the utterances of the Supreme Court as the epitome of jurisprudence on the law merchant in this country, I must adhere to it, and so doing, I feel constrained to dissent from the views expressed in the opinions of the majority of the court.

ON APPLICATION FOR REHEARING.

FENNER, J.   We have attentively considered this application.

Whatever may be said as to the correctness of our interpretation of the decisions of the Supreme Court of the United States in the cases of Otis vs. Cullom and Cooke vs. United States, from which, however, we see no reason to depart, our decision in this case rests upon germinal principles which are not, from any point of view, within the grasp of those cases.   They are based exclusively upon the law merchant.

We hold:

1. That the law merchant is only applicable in the State of Louisiana in so far as it has been embodied in, or is not in conflict with, the laws of the State; and that, while it has been long recognized as part of the law of the State, nothing prevents the State, in the exercise of its legislative power, from abrogating, repealing or modifying it, provided such legislation operates prospectively, and does not impair contract rights existing prior to, or at the date of, such legislation.

2. That the true meaning and effect of the constitutional provisions herein cited were to repeal and abrogate the law merchant so far as it applied to the instruments in question, this judicial construction being not a new one, but resting on precedent decisions of this court in cases entirely analogous to the instant one.

3. That the rights asserted by the defendants here all arose after the adoption of the constitutional provisions referred to and after the conditions which gave effect to those provisions had occurred; and, therefore, that those rights must be governed, not by the law merchant, but by the special laws thus enacted and interpreted by this court.

4. That thus the instruments in controversy lost the qualities of negotiable instruments and became subject to the laws of this State governing the rights and obligations of parties in the transfer of non-negotiable incorporeal rights.

5. That this court, being the creature of the Constitution, is bound to obey, to apply, and to enforce the mandates of that Constitution, in so far as they do not conflict with the paramount authority of the Constitution of the United States.

6. That the Supreme Court of the United States has never ex-

tended the principles suggested by even the broadest interpretation of Otis vs. Cullom and Cooke vs. United States to a case in any degree resembling the instant one, where the nullity of the instruments has been denounced by the Constitution of the State, and where the State, as constituted, not only can not be forced, but lacks the power to recognize or provide for them, and where the law merchant, so far as applicable to them, has been repealed.

7. If the instruments involved in Cooke vs. United States had belonged to a class which the Constitution of the United States had stricken with nullity, and had forbidden the government from paying or providing for, that case would have been more germane to the instant one, and the decision would have been different.

8. While Otis vs. Cullom contains general expressions of apparently broader import, the true and sufficient principle on which it rests is clearly stated, viz.: the purchaser got what he bought and intended to buy. We can discover no principle of law under which, in a contract of sale, intended by both parties to be the sale and purchase of valid bonds of the State of which there were many subject to no question, the vendor could discharge his obligation by delivering worthless similitudes of such valid bonds, and could throw upon the innocent purchaser the loss instead of looking to his own transferrer to make him whole.

Rehearing refused.

Watkins, J., adheres to his dissenting opinion.