80   427
91   658

## Richmond.

BRANCH *v.* COMMISSIONERS OF SINKING FUND.

APRIL 9th, 1885.

1. NEGOTIABLE INSTRUMENTS—*Theft—Maker's liability*—Note payable to bearer has been delivered, stolen from *the owner*, and come to *bona fide* holder for value. Latter may recover on it against the maker. *Secus*, where the note has not been delivered, or if delivered, has been returned to maker, and stolen from *him*.

2. IDEM—*Coupon bond—Theft of—Maker's liability—Case at bar.*—Two coupon bonds issued by the state of Virginia, payable to bearer, are redeemed by the state, and other bonds issued in their stead. Later the bonds were stolen from the state treasury, came into the hands of B., a *bona fide* holder for value without notice of the theft, and by B. were presented to the commissioners of the sinking fund, to be funded into other bonds of the state. The commissioners refused, on the ground that the bonds had been stolen from the state treasury. B. applied for a *mandamus.*

HELD :

Mandamus denied.

Petition of Thomas Branch & Co. for a writ of *mandamus* to compel the commissioners of the sinking fund of the state of Virginia, to fund two coupon bonds of the state, numbered 7,742 and 4861, and dated August 4th, 1853, and January 1st, 1867, respectively, and payable to bearer; which bonds had been redeemed by the state, and a registered bond, numbered 595, dated January 11th, 1866, issued instead of number 7742, and a coupon bond, dated January 1st, 1866, issued instead of number 4861; and which bonds, numbered 7742, and 4861, respectively, had been subsequently stolen from the treasury of

the state, and had been afterwards purchased, *bona fide* for value, without notice of the theft, by the petitioners from one John B. Manning, a broker and member of the New York stock exchange.

Opinion states the case.

*Pegram & Stringfellow*, for petitioners.

*Attorney-General, F. S. Blair*, and *Judge E. C. Burks*, for respondents.

Fauntleroy, J., delivered the opinion of the court.

Upon the petition of John P. Branch and Fred. R. Scott, partners trading under the name of Thomas Branch & Co., representing that, on the 2d of June, 1879, they purchased from John B. Manning, a broker, and member of the New York stock exchange, a coupon bond of the state of Virginia, issued under an act passed by the general assembly, May 25th, 1852, dated August 4th, 1853, of the par value of $1,000, and numbered 7742; and on the 24th day of June, 1879, they purchased from the same party another coupon bond of the par value of $500, numbered 4861, and issued under an act passed March 2d, 1866, and dated January 1st, 1867, for which they paid the full market price; that both of said bonds are payable to bearer, and redeemable after the 1st day of January, 1887; that under the acts of February 14th, 1882, and November 29th, 1884, they are entitled to have said bonds, with the coupons attached, funded into or exchanged for bonds, or a bond and fractional certificates, as provided in said acts; that Morton Marye, first auditor of the state, F. G. Ruffin, second auditor, and Isaac R. Barksdale, treasurer, constitute the board of commissioners of the sinking fund, and are charged by law with the duty of issuing bonds and fractional certificates, under the aforesaid acts of February 14th, 1882, and November 29th,

1884, and of exchanging the same for the bonds and coupons held by petitioners; that the petitioners presented their said bonds, and coupons attached, from January 1st, 1880, inclusive, to the said board of commissioners of the sinking fund, and demanded that they should fund or exchange the same, and issue to them the bond and fractional certificates to which they are entitled under the terms and provisions of the aforesaid acts of Feb'y 14th, 1882, and Nov'r 29th, 1884, which the said board refused to do, upon the ground that the said bonds were stolen; a rule was awarded by this court against the said Morton Marye, first auditor, Frank G. Ruffin, second auditor, and Isaac R. Barksdale, treasurer, constituting the board of commissioners of the sinking fund, to appear here on the 5th day of March, 1885, and show cause, if any they can, why the commonwealth's writ of *mandamus* should not be awarded the petitioners to command the said Morton Marye, first auditor, Frank G. Ruffin, second auditor, and Isaac R. Barksdale, treasurer, constituting the board of commissioners of the sinking fund, to issue to petitioners the bond and fractional certificates to which they allege themselves to be entitled under the said acts of February 14th, 1882, and November 29th, 1884, in manner and form, and for the amounts required by said acts, in exchange for their bonds and coupons aforesaid.

To this rule *nisi* the respondents make return, and demur to the petition and to the rule as insufficient in law, and answer, that they believe that the two bonds with the coupons attached referred to in the rule and filed with the petition, to-wit: bond No. 7742, for $1,000, dated August 4th, 1853, and bond No. 4861, for $500, dated January 1st, 1867, were duly issued by the commonwealth at their respective dates. That both of these bonds were, after being issued, duly redeemed by the commonwealth, by giving in exchange for them other bonds of the commonwealth, to-wit: a registered bond No. 595, dated January 11th, 1860, in lieu of bond No. 7742, and a coupon

bond, dated January 1st, 1866, in lieu of bond No. 4861, as shown by duly attested copies of the records in the offices of the treasurer and second auditor, herewith filed as a part of this answer.. The said bonds No. 7742 and No. 4861, were taken in by the state at the respective dates of redemption thereof, and filed by the treasurer for preservation in his office. Though noted on the records aforesaid, by marks of cancellation, as cancelled, yet, as it appears, no actual marks of cancellation were then impressed on the face of said bonds, and afterwards they were stolen or unlawfully abstracted from the office of the treasurer by some person or persons unknown to respondents; and in June, 1879, came into the hands of petitioners (Thomas Branch & Co.), who presented them, on the 17th day of August, 1882, to the then commissioners of the sinking fund, to be funded under the act of the general assembly (popularly known as the "Riddleberger Bill"), approved February 14th, 1882.

. When the bonds were thus presented, it was discovered, from the records of the treasurer's office, after R. W. N. Noland, a clerk in the said office, had put marks of cancellation on said bonds and the coupons attached, that the said bonds had theretofore been redeemed as aforesaid, and noted on said records by marks as cancelled; and thereupon the then commissioners of the sinking fund refused to fund them. Afterwards, to-wit: on the        day of        , 1885, the petitioners (Thomas Branch & Co.) presented the said bonds, with the coupons attached, to respondents, then and now commissioners of the sinking fund, and asked that they be funded, under the act aforesaid of February 14th, 1882, and the act amendatory thereof, approved November 29th, 1884. Respondents, as commissioners aforesaid, refused to fund the said bonds and coupons, and they are advised that they properly so refused, and cannot be required by this honorable court to fund them.

First. Because the said bonds, with the coupons, having been stolen, or unlawfully abstracted from the custody of the state,

after they had been redeemed and taken in as aforesaid, she is not liable for them to the petitioners, although they may be, as they claim to be, *bona fide* purchasers for value, without notice.

Secondly. Because even if the state be so liable, she has given no authority to respondents, either by the act aforesaid of February 14th, 1882, or any other act, to fund said bonds and coupons under the circumstances stated.   To this return the relators demurred.

The relators claim that these bonds and coupons are negotiable instruments, having all the qualities of negotiable paper; and that they are *bona fide* holders thereof for valuable consideration, and had no notice of the theft at the time they acquired them: and that, as such, they are entitled to fund or exchange them under and according to the terms and intendment of. the act of February 14th, 1882 (known as the "Riddleberger bill"), and the act of November 29th, 1884, amendatory thereof.   The said bonds are not yet due, and this is not a suit for payment; yet the question at issue, to be decided by this court, is, whether the said bonds and coupons attached are the legal obligations of the state of Virginia?   It is true, that they might be such, and yet not fundable under the act of February 14th, 1882, and the act amendatory thereof, of November 29th, 1884, if true, as contended by the respondents, that the said acts confer no authority upon them to fund these stolen bonds; they being not within the purview or comprehension and enumeration of the said acts; yet, undeniably and admittedly, if they be not the legal obligations of the state, they are not fundable under the acts aforesaid, and the respondents have properly refused so to fund them.

We are of opinion that, after these bonds with their appurtenances had been redeemed by the state, and taken into her possession and custody, they ceased to be her obligations; and could not again become such unless she voluntarily *redelivered* or *reissued* them.   They had run their career, and fulfilled their mission, and had returned to the dusty depository of dead mat-

ter in the treasury; and they had been substituted by outstanding equivalents which represent the legal and moral obligations of the state. They had no longer any legal inception or existence as the bonds of the state, and they were and are as though they never had been; and their vitality could never be restored without intentional and voluntary *redelivery* by the state:—certainly they could not be resurrected to the righteous judgment of a court of justice by robbery or theft!

In the case of *Burson* v. *Huntington*, 21 Michigan, 415. (decided in 1870), the court says: " The wrongful act of a thief or trespasser may deprive the *holder* of his property in a note which has once become a note, or property, by delivery; and may transfer the title to an innocent purchaser for value. But a note in the hands of the *maker*, before delivery, is not property, nor the subject of ownership as such:—it is, in law, but a blank piece of paper." And on page 431, " When a note payable to bearer, which has once become operative by delivery, has been lost or stolen from *the owner*, and has subsequently come to the hands of a *bona fide* holder for value, the latter may recover against the maker, and all indorsers on the paper when in the hands of the loser, and the loser must sustain the loss. In such a case there was a complete legal instrument; the maker is clearly liable to pay it to some one, and the question is only *to whom*. But in the case before us, where the note had never been delivered, and therefore had no legal inception or existence as a note, the question is whether he is liable to pay at all—even to an innocent holder for value." And again, on page 434, " When the maker or indorser has himself been deceived by the fraudulent acts or representations of the payee, or others, and thereby induced to deliver or part with the note, or indorsement, and the same is thus fraudulently obtained from him, he must, doubtless, as between him and an innocent holder for value, bear the consequences of his own credulity and want of caution. He has placed a confidence in another, and, by putting the paper into his hands, has enabled him to

appear as the owner, and deceive others. Cases of this kind are numerous; but they have no bearing upon the wrongful taking from the maker, when he never voluntarily parted with the instrument. Much confusion, however, has arisen from the general language used in the books, and sometimes by judges, in reference to cases where the maker has voluntarily parted with the possession, though induced to do so by fraud: when it is laid down, as a general rule, that it is no defence for a maker, as against a *bona fide* holder, to show that the note was wrongfully or fraudulently obtained, without attempting to distinguish between cases where the maker has actually and voluntarily parted with the possession of the note, and those where he has not." In the case of *Hall* v. *Wilson*, 16 Barbour, 555, the court says, "It may be safely asserted, upon principle as well as authority, that the note [which had been stolen *from the maker*,] never had an inception so as to enable any person to become a *bona fide* holder of it. It was an imperfect instrument, *wanting delivery to give it vitality* as the promissory note of the defendant. The holder has taken but a blank piece of paper, not a promissory note."

In the case of *Baxendale* v. *Bennett*, 3 Law Reports (Queen's Bench Decisions), p. 525, (decided in 1878) *Bramwell, J.*, says: "It must be admitted that the cases of *Young* v. *Grote*, 4 Bingham, 253, and *Ingham* v. *Primrose*, 7 C. B. (N. S.) 82, go a long way to justify this judgment; but in all those cases, and in all the others where the alleged maker or acceptor has been held liable, he has voluntarily parted with the instrument: it has not been got from him by the commission of a crime. This undoubtedly is a distinction, and a real distinction. The defendant here has not voluntarily put into anyone's hands the means, or part of the means, for committing a crime. But, it is said, that he has done so through negligence. I confess I think he has been negligent; that is to say, I think that if he had had this paper from a third person, as a bailee bound to keep it with ordinary care, he would not have done so; but

then this negligence is not the proximate or effective cause of the fraud; a crime was necessary for its completion. Then the *Bank of Ireland* v. *Evans' trustees*, (5 H. L. C. 389) shows under such circumstances there is no estoppel." In the same case, *Brett, J.*, says, "In this case I agree with the conclusion at which my brother Bramwell has arrived, but not with his reasons. * * * In this case it is true that the defendant, after writing his name across the stamped paper, sent it to another person to be used. When he sent it to that person, if he had filled it in to any amount that the stamp would cover, the defendant would be liable; because he *sent it with the intention that it should be acted upon;* but it was sent back to the defendant, *and he was then in the same condition as if he had never issued the acceptance.*"

That there must be delivery of the paper, either actually or constructively, is clear. *First National Bank* v. *Strang*, 72 Ill. 559; *Burson* v. *Huntington*, 21 Mich. 415; *Baxendale* v. *Bennett*, 3 Law Reports (Queen's Bench Decisions) 525. Where a negotiable bill or note is stolen *from the acceptor or maker*, such party is not liable thereon to a *bona fide* endorser for value; even though the acceptor or maker somewhat facilitated the theft by putting the paper in an unlocked drawer in chambers, to which his clerk, laundress and other persons, had access. *Baxendale* v. *Bennett*, *supra*, and cases cited in Bigelow's Bills and Notes, 572–3.

Upon these authorities there could be no recovery upon the bonds and coupons held by the relators, if this were a suit for payment at or after maturity; and they cannot be funded, because they are not the legal outstanding obligations of the state of Virginia, having been redeemed and extinguished, and substituted by her equivalent bonds, as set forth in the return made by respondents to the rule *nisi*.

But it may be remarked here, that when these bonds were received by the relators from the New York broker, who received them from the unknown thief who abstracted them from

the effete matter in custody of the treasurer of the state, the act of February 14th, 1882, and the act of 29th November, 1884, had not been passed, nor even conceived; and, therefore, even if they were just and legal obligations of the state, to be paid at maturity, the contract of the state was to pay money, not to give other bonds for them.

There is no hardship in this case. In 1879, when the relators, who lived in Richmond, the capital of the state, bought these stolen bonds, the legislative and newspaper reports were rife with suspicions and charges of frauds and thefts, and missing bonds of the state; and they were guilty of contributory negligence in that they did not inquire and inform themselves, as they could and ought to have done, by a breath, as to the genuineness of these bonds.

If it be proverbially true that the hand of innocence itself may not pluck a rose without a thorn, it certainly behooves the "*money changers*," who speculate in Virginia's financial complications, to inquire if they are dealing with the genuine obligations of the state, or with surreptitious securities.

We are of opinion that the respondents, "commissioners of the sinking fund," have made a good and sufficient return to the rule *nisi;* and that it must be discharged, and the peremptory writ prayed for denied.

Rule discharged, and the writ denied.

LACY, J., and RICHARDSON, J., concurred in the opinion of FAUNTLEROY, J.

HINTON, J., concurred in the results.

LEWIS, P., dissented.

WRIT DENIED.