Ruohs v. Bank.

RUOHS v. BANK.

(*Knoxville.* November 8, 1894.)

1. MUNICIPAL BONDS. *Guaranty of validity and solvency.*

The seller of negotiable municipal bonds does not, in the absence of express contract to that effect, incur the liability of a guarantor of their validity and solvency to the purchaser. The proof does not show any express contract of guaranty in this case. (*Post, pp. 61–70.*)

Cases cited and approved: Bank v. Oldham, 6 Lea, 718–728; Gowen v. Shute, 4 Bax., 57; Crockett v. Alexander, 5 Heis., 106; Cross v. Sells, 1 Heis., 83; Mathews v. Thompson, 2 Heis., 588; Scruggs v. Gass, 8 Yer., 175; Ware v. Street, 2 Head, 609; Walker v. C ark, 2 Leg. R., 42; 92 U. S., 147; 115 U. S., 384; 124 U. S., 545.

2. SAME. *Seller's liability for misrepresentation.*

The seller does not incur liability to the purchaser·for misrepresentation in the sale of negotiable municipal bonds, that were, unknown to both parties, void for want of corporate existence of the municipality issuing them, where the seller expressed an honest, though mistaken, opinion in favor of their validity, but falsely represented their desirability as an investment, and the purchaser delayed unduly to rescind the contract of sale after acquiring notice of the facts adversely affecting the validity and value of the bonds. (*Post, pp. 69–74.*)

Cases cited and approved: Knuckolls v. Lea, 10 Hum., 577; 93 U. S., 55, 631; 46 Fed. Rep., 727; 149 Mass. (S. C., 2 L. R. A., 743).

3. SAME. *Seller not liable for mutual mistake as to validity.*

The seller incurs no liability to the purchaser of negotiable municipal bonds, where the bonds, supposed by both parties to be valid at date of sale, are declared void in a subsequent suit for their enforcement, by reason of the invalidity of the charter of the municipality. (*Post, pp. 74–76.*)

4. BANKS AND BANKING. *Liability for fraud of officers.*

An incorporated bank is not liable for fraudulent acts of its officers performed in a transaction conducted for their private

benefit, although they may have illegally used the funds and credit of the bank in effecting their purpose. (*Post, pp. 71. 72.*)

FROM HAMILTON.

Appeal from Chancery Court of Hamilton County. T. M. McCONNELL, Ch.

WM. H. DeWITT and PRITCHARD & SIZER for Ruohs.

WHITE & MARTIN, DANIELS & GARVIN, CLARK & BROWN for Bank.

WILKES, J.  Complainant, Ruohs, bought twenty-two bonds, purporting to have been issued by the town of Athens, Tenn., in aid of the Nashville and Tellico Railroad Company, each for one thousand dollars, and paid for the same $19,800, or at the rate of ninety cents on the dollar.  He afterward brought suit against the town of Athens to recover the amount then due him on said bonds, when it was held that the charter of the town of Athens was void, and its bonds, as a consequence, were invalid and void, even in his hands as a *bona fide* holder for value, and relief was denied him.  See the case of *Ruohs* v. *Athens*, 7 Pick., 20.

The present bill is filed to hold the defendants, Third National Bank of Chattanooga, W. E. Bas-

kett, its cashier; W. H. Hart, vice president, and the representatives of Jno. A. Hart, its president, liable for said bonds.

The grounds upon which it is sought to hold the defendants liable are guaranty, "express and implied," fraudulent misrepresentations, and mutual mistake, in the sale of the bonds to Ruohs, in which it is charged the bank, as a corporation, and its officers, as individuals, participated.

Much proof was taken, and, on the hearing, the Chancellor denied complainant any relief, and dismissed his bill, from which he appealed, and has assigned errors.

There is no controversy but that complainant is a *bona fide* purchaser of the bonds, for full value, and without actual notice of their invalidity; that he paid the sum of $19,800 for them, and that there is a total failure of consideration in the fact that the bonds are invalid and void.

Complainant's view of the case is, that he was a patron of the defendant bank, kept a large amount of money on deposit in it, had the utmost confidence in its officers, and trusted largely to their representations and statements in his business matters.

He was approached by John A. Hart, the president, with an offer to sell him the twenty-two bonds, and, knowing nothing of them, he sought the advice of Hart, and inquired specially as to the solvency and validity of the bonds, and was assured by Hart that they were regular and valid, that the officers of

the bank had made an investigation at Athens and found the bonds were all right, and they would prove a good investment and be worth a premium. Hart represented that he would be glad to buy them himself if complainant would lend him the necessary money. He further represented, that the bonds belonged to a Louisville party, and the bank was only interested in selling them for a commission. Similar inquiries were made of the cashier, Baskett, and vice president, W. H. Hart, and they also assured complainant that the bonds were good. Complainant, relying upon these representations, made no further inquiries, except to consult legal counsel whether the bonds were regular on their face.

Complainant charges that the Harts and Baskett conspired together to mislead him; that they had already bought the bonds for seventy-two and one half cents on the dollar, and sold them to complainant for ninety cents, and this was done with the intention, afterwards consummated, to appropriate and divide the profits.

The bank filed a demurrer, and demurrers were also incorporated in the answers of the officers as individuals. The bill was amended so as to charge, more distinctly, conspiracy on the part of the bank and its officers to defraud complainant, and that the defendants acted for the bank as well as for themselves, and that the spoils were divided between the bank and the officers.

A second demurrer was filed by the bank, set-

ting up, among other grounds, that the act, as charged, was *ultra vires* so far as the bank was concerned. This demurrer was overruled, with liberty to rely on the same in answer.

It is insisted, with great earnestness and zeal, that the Chancellor erred in refusing to grant the relief asked against each and all of the defendants. The grounds on which complainant bases his claim to relief are, in substance:

*First.*—That the officers and bank guaranteed the validity and solvency of the bonds by express stipulation; and if this cannot be maintained, such guaranty will be implied from the transaction itself.

*Second.*—That the officers of the bank made false and fraudulent misrepresentations in regard to the bonds and their validity and solvency, upon which complainant relied, and for which he is entitled to hold both the bank and the officers liable to the extent of the bonds, or at least the amount paid for them.

*Third.*—If neither of these contentions can be maintained, still complainant can hold both the bank and its officers for the full amount paid for the bonds, on the ground of mutual mistake of the parties in dealing with the bonds, which had no legal existence, and which proved to be utterly void.

It appears that when the bonds were issued by the town of Athens, they went into the hands of R. L. Bright, president of the railroad company, and were by him hypothecated—one half with the First

National Bank of Athens, and the other half with the Bank of Fayetteville, Tennessee.

About the first of November, 1888, while Bright was in New York, he sold the bonds to a party to him then unknown, but represented by Defendant Baskett. He had previously been negotiating for a sale of the bonds with Jno. A. Hart and Baskett. He states that he did not know the bank at all in the transaction; that the negotiations were made with Jno. A. 'Hart and Baskett, and, if the bank had any connection with it, he did not know it. He further states, however, that when he returned, a memorandum was presented to him, showing how the proceeds had been applied, and that $354.75 of the proceeds had been applied as a credit on a note he owed the bank individually, and that this amount, together with the amounts paid the Athens and Fayetteville banks, and a commission to Baskett of $159.50 (or one per cent.), consumed the proceeds of the sale—$15,950.

He cannot account for this $354.75 transaction, except by saying that Hart and Baskett, having possession of the money, and being officers of the bank, had it credited upon his note to the bank, and he accounted for the same to the railroad company.

He states, in a second deposition, that he knew the bank only as a collecting agent, and did not know it had any interest in the purchase, but supposed he was selling to Baskett and Hart, and possibly other parties than the bank, otherwise he would

probably not have sent the bonds to the bank for collection. Instructions were given to the Athens bank to turn its bonds over to Baskett, and the Fayetteville bank's bonds were sent to the defendant bank for collection from Baskett and associates, if any.

Baskett's testimony is that he bought the bonds for Jno. A. Hart, and the bank was not interested in the purchase in any way or to any extent, and had nothing to do with the sale to the complainant, and received none of the profits of the sale.

It appears that Fisher, the cashier of the Athens bank, on November 9 went to Chattanooga to get his money for the bonds held by his bank as collateral, and was told by Baskett that the bonds had been sold, but that the party buying could not complete his financial arrangements for a week; that the bank was then quite close, otherwise it would loan the purchaser the money to take up the bonds; and, thereupon, on Fisher's suggestion that his bank did not need the money, but wanted to close the transaction, and would take a six months' certificate of deposit, without interest, on the Chattanooga bank for the amount due it, Baskett agreed to give, and did deliver to Fisher, the bank's certificate of deposit for the amount due him.

The bonds, as a matter of fact, were not at that date sold to complainant, and not until November 26. In the meantime, on November 21, 1888, the following letter was sent to complainant by John A. Hart, to-wit:

"CHATTANOOGA, TENN., Nov. 21, 1888.

"This morning I received permission to sell the bonds I offered you at ninety cents net. If I had the money, I would prefer buying them myself. If you would loan me the money one year, at seven per cent., and take them as collateral, I would like to do so, but if not, and you still wish them, please call at the bank and I will let you have them, or, if you prefer, I will bring them over to your house. I must have a final answer Friday morning at 10 o'clock. Please answer.

"Yours very truly,

"JOHN A. HART."

Complainant states that the negotiations were made with him for sale of the bonds mostly at the banking house, and were conducted sometimes between complainant and John A. Hart, and at other times between complainant and Baskett, and again between complainant, Baskett, and John A. Hart, and once or twice, pending the negotiations, W. H. Hart talked with complainant about the bonds and the pending sale. The trade was finally consummated in the president's room in the bank.

It also appears that W. H. Hart, at the instance of John A. Hart, went to Athens to investigate the bonds, and interviewed Ivins, the mayor, for information. His version is, that Ivins told him some citizens had talked about enjoining the bonds, but that all difficulty had been removed, and W. H. Hart reported this to John A. Hart and Baskett.

Ivins says he stated to Hart that there was much feeling in the community about the bonds, and much, talk of contesting their validity.

A few days thereafter John A. Hart wrote to Ivins in regard to the bonds, who, instead of replying, wired John A. Hart that he would come to Chattanooga and. meet him at the Read House. They met, and Ivins says he put John A. Hart specially on his guard, that the bonds would be contested, and that he had reliable legal advice that they could be successfully resisted, and steps were about to be taken to that end.

Complainant had not bought the bonds at that date, and of this interview and conversation he had no information until after this bill was filed. It also appears that, after the bonds had been bought by complainant, John A. Hart, upon one occasion, in a saloon, over a glass of beer, stated that he would go on record as the only man that had ever beaten Joe Ruohs, but refused to explain what he referred to.

Complainant states, generally and repeatedly, that John A. Hart and Baskett both represented to him that they had investigated, and the bonds were valid; that Hart called at his residence, and pressed him to buy; said the bonds were worth par, represented that he was selling for a Louisville party, orally guaranteed the validity and solvency of the bonds, and withheld from him the information he had received from Ivins. He is emphatic that Hart

5—10 p

and Baskett purported to be acting for the bank, which was to receive a small commission only for its services. Complainant has no other than his own testimony to sustain this insistence of an oral guaranty, and we are constrained to believe, from the entire record, that this contention is not maintained, even upon complainant's own theory and version of the transaction. It is not at all probable that complainant, if he had desired a guaranty, would have been content with an oral one in a matter of this magnitude, and to run for twenty years, but he would have demanded a written one. It is not at all reasonable, that if the officers were negotiating for the bank, as complainant states, they would have been willing to guarantee the bonds individually. It is not at all reasonable, if they were professing to act for Louisville parties, merely for a small commission, that they would have been willing to give their personal indorsement to effect the trade; and if they contemplated perpetrating a fraud, as complainant charges, they would not have been willing to make a guaranty that they, in a very short time, would probably be called on to make good. This is looking at the matter from complainant's standpoint.

From defendant's point of view, it appears that John A. Hart is dead, and we cannot have his testimony. W. H. Hart, Baskett, and D. E. Reese all deny emphatically that such guaranty was made, though complainant states that the guaranty was made or repeated in their presence.

If there had been such guaranty, complainant, when the validity of the bonds was first questioned, would, most likely, at once have tendered them back, and enforced his guaranty. The result is, complainant must fail, both as to the bank and the individual defendants, so far as he relies upon an *express guaranty*, in the absence of proof of such *express guaranty*.

The question next arises, what is the liability of the seller or assignor of such bonds, and is there any implied warranty or guaranty?

The case is very similar to that of *Otis* v. *Cullom*, 92 U. S., p. 147. That case was this: The city of Topeka, Kansas, under two Acts of the Legislature, issued $100,000 of municipal bonds. They became the property of the First National Bank of Topeka. The bank sold $18,000 of them to the plaintiff in error. The interest was defaulted and suit was brought. It was held that the bonds were void because the Legislature had no power to pass the enabling Acts. Thereupon the vendee sued the receiver of the vendor bank to recover the amount paid for the void bonds. Held, that the holder of the void bonds could not recover. The Supreme Court says: "Such securities throng the channels of commerce, which they are made to seek, and where they find their market. They pass from hand to hand, like bank notes. The seller is liable *ex delicto* for bad faith, and *ex contractu* there is an implied warranty on his part that they belong to him, and that they are not forgeries.

*Where · there is no express stipulation, there is no lia-
bility beyond this.* If the buyer desires special pro-
tection, he must take a guaranty. He can dictate
its terms, and refuse to buy unless it be given. If
not taken, he cannot occupy the vantage ground upon
which it would have placed him. It would be un-
reasonably harsh to hold all those through whose
hands such instruments may have passed liable ac-
cording to the principles which the plaintiff in error
insists shall be applied in this case." See also
*Bank* v. *Burgen County*, 115 U. S., 384; *Ætna
Life Insurance Co.* v. *Middleport*, 124 U. S., 545;
Jones on Corporate Bonds and Mortgages, Sec. 220.

The doctrine of *Otis* v. *Cullom* is recognized, and
the case approved, in *First National Bank* v. *Old-
ham*, 6 Lea, 718–728.

The same doctrine is recognized and applied by
this Court where a note was given for worthless
"Mississippi cotton money." *Gowen* v. *Shute*, 4
Bax., 57.

And, again, contracts based upon illegally issued
Bank of Tennessee money were upheld by this
Court. *Crockett* v. *Alexander*, 5 Heis., 106.

So, transactions had with Confederate money, after
it was worthless, were sustained. *Cross* v. *Sells*, 1
Heis., 83; *Mathews* v. *Thompson*, 2 Heis., 588.

So, payment in worthless bank bills was held
binding, and operated as a satisfaction of the debt.
*Scruggs* v. *Gass*, 8 Yer., 175. In this case,
Judge Catron, in delivering the opinion of the

Court, says: "To adopt a different rule would end in much litigation and confusion. Scruggs could recover from Gass; the latter, of course, could have his remedy against the person from whom he received the paper, and, by this means, it would be traced back by suits to the holder at the period when the bank refused specie payment; * * * a rule which, if adopted, would threaten endless strife and litigation." Thus resting the case upon the same reason given by the United States Supreme Court in *Otis* v. *Cullom*, in 92 U. S., hereinbefore cited. To the same effect is the case of *Ware* v. *Street*, 2 Head, 609.

So, where a party assigned a note for land (void on its face for usury) without recourse, held, in the absence of fraud and deceit, that there was no implied warranty or right to recover upon the original consideration. *Walker* v. *Clark*, 2 Leg. R., 42.

A different rule prevails in many cases, in regard to such securities as these, from the rule governing the transfer of private bills and notes, and the distinction and reason for it is clearly pointed out in Tiedeman on Commercial Paper, Sec. 244, pages 404, 405.

We are of opinion complainant cannot hold the defendants liable on the idea of an *implied warranty or guaranty* of the validity or solvency of the bonds.

Can the defendants be held liable on the grounds of fraudulent misrepresentations or mutual mistake? It is proper to keep in view in this case that the

cause of the loss was the invalidity of the bonds, because the town of Athens had no corporate existence, and hence no power to issue the bonds.

We are thoroughly satisfied in this case that misrepresentations and false statements were made to the complainant in the course of these negotiations by John A. Hart; that false impressions as to the desirability of the bonds and their value were made by said John A. Hart; and that the conduct of Baskett and W. H. Hart, especially the former, was calculated to, and did, mislead the complainant in deciding upon the desirability of the bonds.

The complainant was induced to believe that the bonds were the property of a party in Louisville, and that Hart and Baskett were simply trying to place them, and had no interest in them except a small commission, when, at the very time, Hart, through Baskett, had already bargained for the bonds at seventy-two and one half cents, and, without paying for them himself, was negotiating to sell them at ninety cents to complainant, with a view of appropriating the profits to the use of himself, Baskett, and W. H. Hart, which he afterward did, and Baskett and W. H. Hart connived at, and aided, so far as opportunity offered, in carrying this scheme into effect.

In doing so, Jno. A. Hart, principally, and Baskett and W. H. Hart, in a subordinate manner, made representations as to the desirability of the bonds, and their value, which were not warranted by

the facts. To some extent they concealed from complainant certain facts concerning the status of the bonds at Athens, and concealed from him the fact that there was a considerable feeling of opposition to them, and a disposition to contest and avoid them; but we are satisfied the parties did not know the bonds were invalid for the reasons and upon the grounds afterward held by the Court, and did not fraudulently misrepresent to complainant facts connected with their validity which were only developed by the subsequent suit, and made vital by the determination of this Court.

There can be no doubt but that the two Harts and Baskett co-operated in the transactions which resulted in the sale of the bonds, and were, to some extent, if not equally, concerned in the representations made. We are satisfied that the bank, as a bank, was not a party to the transaction or the misrepresentations, but it is apparent that the Harts and Baskett were using the credit and funds of the bank, and their connection with it, to further their individual scheme to effect the sale, and divide the profits among themselves, which they did, the bank receiving no part of it, not even the commissions.

The certificate of deposit given to Fisher, the cashier of the bank at Athens, was wholly unwarranted, and did not represent an actual deposit of money in bank, and was not a real bank transaction, but a simulated one, in order to obtain credit, and carry the bonds for Jno. A. Hart until the individ-

uals could unload them. The cashing of the checks handed over by complainant when he paid for the bonds, was, in effect, the same kind of a transaction, and all the details are . such as these individuals had the opportunity to execute by virtue of their official connection with the bank, and which they did all the while for themselves, and not for the bank. Complainant says he was dealing with the bank, and doubtless he so believed; but the facts did not sustain this contention, and his belief cannot change the facts as they exist.

We see no tenable ground on which complainant can hold the bank in any event or for any reason.

Very serious obstacles arise in the way of complainant in holding the officers liable as individuals. The first is complainant's persistent statement that he dealt with the bank, and not with the individuals, and that the bank is liable to him because the individuals acted *for the bank*. Another is the fact that, after ascertaining the trouble with the bonds, he saw proper to hold on to them and attempt to enforce them against the maker for their full face value, instead of returning them to the defendants and seeking to hold them liable for the price paid.

Tiedeman, in his work on sales, lays down the rule of law in such cases as follows: "It is also. necessary that the defrauded party should do nothing, after the discovery of the fraud, which would in any way admit the existence and validity of the contract. Such an admission, if clear, will operate as a bar

to his right of rescission for fraud; for example, it would be fatal to his right to rescind where he has mingled the property with his own, or offered it for sale, or in any other way exercised any rights of ownership over the goods." Tiedeman on Sales, Sec. 163.

Here, however, is a case *in equity* where promptness and diligence are far more essential and material. *Donaldson* v. *Farwell*, 93 U. S., 631; *Grymes* v. *Sanders*, 93 U. S., 55; *Johnston* v. *Standard M. Co.*, 148 U. S., 366; *Knuckolls* v. *Lea*, 10 Hum., 577.

Mr. Pomeroy states the rule as follows: "All these considerations as to the nature of misrepresentations require great punctuality and promptness of action by the deceived party upon his discovery of the fraud. The person who has been misled is required, as soon as he learns the truth, with all reasonable diligence, to disaffirm the contract, or abandon the transaction, and give the other party an opportunity of rescinding it and of restoring both of them to their original position. He is not allowed to go on and derive all possible benefits from the transaction, and then claim to be relieved from his own obligations by a rescission or a refusal to perform on his own part. If, after discovering the untruth of the representations, he conducts himself, with reference to the transaction, as though it were still subsisting and binding, he thereby waives all benefit of, and relief from, the misrepresenta-

tions.'' 2 Pomeroy's Eq. Jur., Sec. 897 (2d Ed.); *Deming* v. *Darling,* 149 Mass. (S. C., 2 L. R. A., 743); Cook on S. and S., Sec. 762 and notes (3d Ed.); *Meyer* v. *Richards,* 46 Fed. Rep., 727.

Another difficulty is that the invalidity of the bonds being · the cause of the loss, and that not having been ascertained and determined when the representations were made, or even at that time suspected, so far as this record discloses, the parties could not have intended to guard against and cover this defect by their representations. At that time it cannot be held that the parties knew the bonds to be illegal and invalid, and falsely represented to the contrary. Nor can their representations, as made in this record, be held to go to the extent that the bonds were valid, but only that, so far as known or believed, they were valid and authorized. To hold that· the parties meant that the bonds could not be invalidated for any reason, would be, in effect, to hold them as guarantors of the bonds, and, as before stated, we cannot so hold under this record. Mere statements in regard to the validity of the bonds involved not questions of fact, but of legal opinion, and the statements, if made, cannot be considered as anything more than expressions of opinion, inasmuch as the fact of validity was not then ascertained and determined.

Much of this reasoning applies to the contention made, that the complainant is entitled to recover because of mutual mistake between the parties. A

mutual mistake as to *an existing fact* is unques-tionably ground for relief and rescission—as, for in-stance, if a horse should be the subject matter of sale, and should be dead when the sale was made, and neither party knew of that fact.    But if we are to hold that there is a mutual mistake about the solvency or validity of securities such as these, which are daily sold in the market, and pass from hand to hand by delivery, it would unsettle many transactions to hold that relief could be granted, as each successive vendee could sue his vendor through-out the whole life of the security, merely because it was, after a long lapse of time, discovered that the original issuance of the bonds was irregular or unwarranted, and the evils so forcibly portrayed by Judge Catron would result.    Unquestionably, if the invalidity of these bonds had already been deter-mined when this sale was made, and the fact had been fixed, and the parties dealt in ignorance of that fact *as an existing condition of affairs*, there would be room for the application of this principle.    Beach's Mod. Equity, 49; Pomeroy's Equity, Secs. 839, 854.

This principle might, with the same consistency, have been invoked in the case of *Otis* v. *Cullom*, or any of the other cases cited, as in this case, and could as well be invoked in any case in which a bond has been or may be held void.    After all, the question involved is not one of fact, and any mistake between these parties was not a mistake of fact, but of legal opinion.

If this doctrine could apply at all, it would prob-
ably only be between the maker and the first ven-
dee of such securities, on the ground that the maker
had received pay for bonds, but had parted with
nothing in return, but could not apply between two
successive purchasers, each of whom had paid for
the bonds, though, it may be, in different amounts.

We think there is no reversible error in the rul-
ings of the Chancellor upon evidence, and do not
deem it important to pass, in detail, upon them.

The conclusion is, that there is no error in the
decree of the Chancellor, and it is affirmed, with
costs.

PETITION TO REHEAR.

WILKES, J. A petition to rehear in this case
urges that at least the estate of John A. Hart
should be held liable, not only for the misrepre-
sentations made by him to complainant, but also
because he *suppressed the conversation* between him-
self and Ivins in regard to the bonds at the Read
House.

A practical difficulty is encountered, at the very
threshold of this contention, in the fact that there
is no evidence that any false representations were
made to complainant by John A. Hart, or any facts
were withheld from him by John A. Hart. This
arises out of the fact that complainant's testimony
is the only testimony on this point, and it was by

the Court excluded so far as it affected the estate of John A. Hart.

The testimony of Ivins as to what occurred between himself and John A. Hart at the Read House is contradictory to other statements made by him to W. H. Hart, and indefinite in its character, and somewhat contradictory in itself.

It does not appear that he told Hart the bonds were invalid for any particular reason, certainly not for the reason for which they were declared invalid afterward, but simply that they would be contested and probably successfully resisted.

The real ground of their invalidity was not then divulged, or even known, so far as this record shows, and Ivins' statement, at best, was only an opinion as to the probable result of a future contest.

It is by no means clear when this conversation took place. Presumably, it was before the bonds were bought by John A. Hart, and this view is sustained by the testimony of W. H. Hart and of Ivins. It is not probable that, after that transaction had been made, John A. Hart would have interested himself in any further investigations of the bonds. It is evident that the communications actually made by Ivins, *whatever they were as a matter of fact*, did not deter Hart from buying the bonds, and from this fact, as well as Ivins' statement made but a few days before to W. H. Hart that the bonds were valid, we are constrained to believe that Ivins did not communicate any existing fact to John A.

Hart calculated to alarm him about the validity of the bonds.

Both W. H. Hart and Baskett prove emphatically that, when John A. Hart bought the bonds, neither he nor they, nor anyone else, so far as they could ascertain, had any suspicion or question of their validity.

The fact that John A. Hart bought the bonds at seventy-two and one half cents, and sold them to complainant for ninety cents, is a fact developed in the record, but this is not urged as a ground of relief.

We see no reason to modify the opinion heretofore expressed, and the petition to rehear is dismissed.