## RICHARDSON *v.* MARSHALL COUNTY.

### (*Nashville.* February 5, 1898.)

1. MUNICIPAL BONDS. *Issued without legislative authority, are non-enforceable.*

   Negotiable bonds issued by counties, cities, or towns, without legislative authority, are void *ab initio*, and nonenforceable in whosesoever hands they come. (*Post, p. 349.*)

   Cases cited and approved: Milan *v.* Railroad, 11 Lea, 329; Colburn *v.* Railroad, 94 Tenn., 43; Johnson City *v.* Railroad, *ante*, p. 138; 111 U. S., 400; 127 U. S., 139, 160; 21 Fed. Rep., 870.

2. SAME. *Estoppel of county by adjudication of validity of.*

   A decree adjudging that railroad aid bonds were "legal and valid," rendered in a suit by taxpayers against a railroad company and the county tax collector to enjoin the collection of taxes laid by the county to pay the interest on the bonds, is conclusive against the county, in favor of one who purchased bonds after its rendition, as to the existence of legislative authority for their issuance, although lack of such authority was not expressly alleged in the bill on which the decree was rendered, where the county, though not a formal party, was cognizant of the decree and has acquiesced in it without complaint, and has paid the interest for a number of years and about one-half of the principal. (*Post, pp. 350, 351.*)

   Case cited: Williams *v.* Railroad, 9 Bax., 488.

3. SAME. *Validity of, determined by judicial construction prevailing at date of issuance.*

   The validity of county bonds in the hands of *bona fide* holders must be determined by the law as it was judicially construed to be when the bonds were put upon the market, although the Court, at the present time, may be inclined to place a different construction upon the law. (*Post, pp. 351, 352.*)

   Cases cited and approved: 101 U. S., 677; 105 U. S., 60, 73.

4. SAME. *Negotiated after cancellation, invalid in hands of innocent purchaser.*

Negotiable county bonds which have been paid and canceled, but have been fraudulently taken from the files and put in circulation after such payment and cancellation, are invalid, even in the hands of a *bona fide* holder. (*Post, pp. 354, 355.*)

Cases cited and approved: 44 La. Ann., 209; 80 Va., 427 (S. C., 56 Am. Rep., 596); 5 Denio, 517.

5. SAME. *No implied warranty by seller of legislative authority for issuance of.*

A seller of negotiable county bonds does not impliedly warrant the existence of legislative authority for their issuance. (*Post, pp. 355, 356.*)

Cases cited and approved: Ruohs *v.* Bank, 94 Tenn., 57; 92 U. S., 447.

6. SAME. *Implied warranty by seller of title and genuineness of.*

The seller of negotiable county bonds impliedly warrants that he has a good title, and that the bonds are genuine, and he is liable to the buyer for loss occasioned by a breach of such warranty. (*Post, pp. 355, 356, 357, 358.*)

7. SAME. *Want of legislative authority to issue, no defense for breach of seller's implied warranty of.*

The seller of negotiable county bonds cannot escape liability for breach of his implied warranty that the bonds are genuine, because the bonds were issued without legislative authority, as to which there was no warranty, express or implied, especially where it appears that the bonds would probably have been paid but for the fact that they had already been paid, and had been fraudulently removed from the files and put in circulation. (*Post, pp. 355–359.*)

8. SAME. *Good faith does not protect seller.*

That the seller of negotiable bonds acted in good faith and entertained an honest belief that he had a good title, affords him no protection in a suit for breach of his implied warranty of the genuineness of the bonds. (*Post, pp. 358, 359.*)

9. CHANCERY PLEADING AND PRACTICE. *Defense proper by answer and not by plea, when.*

The defense to county bonds, that the same have been paid and

Richardson *v.* Marshall County.

canceled, but were fraudulently taken from the files and put in circulation after such payment and cancellation, is properly presented by answer setting up such facts, and a plea of *non est factum*, even if proper, is not necessary. (*Post, pp 353, 354.*)

## FROM MARSHALL.

Appeal from Chancery Court of Marshall County. W. S. BEARDEN, Ch.

McLEMORE, RICHARDSON & DAVIS for Richardson.

J. L. MARSHALL for County.

ARMSTONG, SMITHSON & ARMSTRONG for Bank.

CALDWELL, J. On July 1, 1873, Marshall County issued a series of $115,000 of twenty years, negotiable, interest-bearing, coupon bonds, to the Duck River Valley Railroad Company, in payment of the county's subscription to · the capital stock of the company. Three of these bonds, two for $500 each, and one for $1,000, with the twentieth annual coupon attached to each of them, went into the hands of James D. Richardson, executor, as parts of the assets of the estate of Mrs. N. P. McCord, deceased.

In April, 1895, almost two years after maturity, this bill was filed by the executor to collect these bonds and coupons. The county defended upon two grounds: (1) That the whole series of bonds was issued without legislative authority, and was therefore void; (2) that the particular bonds sued on had been

paid and canceled by the county, and that thereafter some unknown person had fraudulently taken them from its files, and, after removing the indorsed cancellation by means of some chemical, had fraudulently put them in circulation again, without the knowledge or consent of the county.

The Chancellor, without passing on the first of these defenses, was of the opinion that the second one was true in fact and sound in law, and so adjudged, dismissing the bill.

The Court of Chancery Appeals held that the first defense was well made in fact and in law, and that the second one was sustained by the proof, but that it must be unavailing because presented in the form stated by an answer, and not by a formal plea of *non est factum*. The result was an affirmance of the decree of the Chancellor, but upon a different ground.

It is well settled that negotiable bonds issued by counties, cities, or towns, without legislative authority, are void *ab initio*, and nonenforceable in whosesoever hands. *Claiborne Co.* v. *Brooks*, 111 U. S., 400; *Kelley* v. *Milan*, 127 U. S., 139; *Norton* v. *Dyersburg*, *Ib.*, 160; *Pulaski* v. *Gilmore*, 21 Fed. Rep., 870; *Milan* v. *Railroad*, 11 Lea, 329; *Colburn* v. *Railroad*, 94 Tenn., 43; *Johnson City* v. *Three C.'s Railroad*, *ante*, p. 138. But the original validity of all this series of bonds must be held to have been conclusively and finally adjudged long before the present litigation arose.

In December, 1875, E. T. Williams and more than
one hundred other citizens and taxpayers of Marshall
County filed their bill against the railroad company
and the county's tax collector, to restrain and per-
petually enjoin the collection of the taxes laid by
the county to pay the interest on these bonds for
that year. This relief was sought upon the allega-
tions that the railroad company was not chartered
according to law, that the subscription of the county
was not lawfully made, and that there was no "le-
gal warrant or authority for the issuance of said
bonds."

. On final hearing the Chancellor dismissed the bill,
and, on appeal, this Court, in March, 1878, affirmed
his action, and, by its decree, specifically adjudged,
among other things, that the $115,000 of bonds were
"legal and valid."

Although it was not distinctly alleged in the bill
that the absence of "legal warrant or authority" to
issue the bonds was due to a lack of legislative au-
thorization, and although it was not distinctly recited
in the decree that this Court found sufficient author-
ization in existing statutes, it can but be entirely
manifest that the allegation was broad enough to
raise, and the decree specific enough to adjudge, that
exact question. Indeed, when the Court adjudged
that the bonds were "legal and valid," it necessarily,
*ex vi termini*, held that there was ample legislative
authority for their issuance, since without such au-
thority they must unavoidably have been illegal and

invalid. The county was not a formal party to that litigation, nor before the Court otherwise than through its tax collector, yet it was cognizant of the decree, and acquiesced in it without complaint, paid the interest year after year, and parts of the principal from time to time, until about half the bonds were satisfied in full, and then refunded practically all of the others.

In the face of such a decree in such a litigation, and of such a recognition and the consequent encouragement to free circulation in the markets of the country, the county will not at this late day be heard to question the original validity of the bonds upon any ground whatsoever, and especially as against the complainant whose testatrix made her purchase in good faith and for value long after that adjudication, and when nearly all of the interest had been paid on each of the bonds she bought. It may be conceded, as was decided by the Court of Chancery Appeals, that the statutes existing in 1873, when this bond issue was made, did not authorize it, and yet, because the Court of last resort adjudged otherwise, the result would be the same.

Under the maxim that every man is presumed to know the law, all intending purchasers were bound, of course, at their peril, to see that the bonds were issued under competent legal authority. In this, however, they were not required to make an infallible construction of the statutes for themselves, but were allowed to rely upon the adjudication of this Court.

In other words, they were not required to know the law otherwise than as declared, if declared, by the highest tribunal erected for its interpretation. Moreover, should this Court now interpret those statutes differently, and hold that the bonds were issued without proper legislative authorization, the rights of present *bona fide* holders could not ·be disturbed thereby, for the validity of the bonds, in the hands of such persons, must be determined by the law as it was judicially construed to be when the bonds were put upon the market. *Douglass* v. *County of Pike*, 101 U. S., 677; *Taylor* v. *Ypsilanti*, 105 U. S., 60; *New Buffalo* v. *Iron Co.*, *Ib.*, 73.

It should be noted that the opinion filed by this Court (*Williams* v. *Railroad Co.*, 9 Bax., 488) in advance of its decree, mentioned and considered only the impeachment of the railroad's charter and of the county's subscription, and did not refer to the alleged absence of ''legal warrant or authority'' for the issuance of the bonds. That omission in the opinion, however, could not operate now as a limitation upon the scope of the decree, which was subsequent in point of time, and might well have embraced matters not discussed in the opinion. The decree in such a case must be regarded as controlling.

The opinion only, and not the decree, was brought to the attention of the Court of Chancery Appeals; hence, that Court naturally concluded that the question of legislative authority was not involved in that case, and, in view of that fact, made an original

investigation and determination, in the light of subsequent decisions by this Court and the Supreme Court of the United States in relation to other county and municipal bond issues in this State.

We cannot concur with the Court of Chancery Appeals in holding that the second defense of the county could be made available under a plea of *non est factum* only. It may be that the county could prove payment, cancellation, and fraudulent reissuance under such a plea, but we think an answer the more appropriate pleading, in equity, for such a defense. The insistence of the county was, that it had paid each of the bonds now in suit and canceled them, and that after this had been done, some unknown person had purloined them, and by means of a skillful erasure of the indorsed cancellation, fraudulently put them on the market again.

The real defense was best pleaded, the true issue best presented, when the facts relied on were plainly and directly stated in the form of an answer. No denial, disclosure or other averment made, was of such a nature as to demand a plea of *non est factum*. There was, and could have been, no denial that the bonds, in their present form and tenor, were executed by the county; on the contrary, it was distinctly admitted that they had been so executed, and that they were, originally, genuine obligations. The gist of the defense was payment, and it was none the less so because the money was

16 P—23

averred to have been paid to the then owner, and not to the present holder of the bonds.

The Court of Chancery Appeals, having found as a fact that the contention of the county in respect of payment, cancellation, theft, and fraudulent recirculation, was sustained by the proof, should have applied that finding to the answer as an appropriate pleading, and then held as a matter of law that the bonds had been once extinguished and could not be collected a second time.

. Payment and cancellation worked an absolute extinguishment of the bonds, and rendered them null and void to all intents and purposes. When paid and canceled they were utterly dead and incapable of revitalization by theft and fraudulent recirculation. No sort of manipulation by the thief could revive extinct obligations or create new ones. Hence, the bonds in suit are without vitality and not collectible.

In *Pugh* v. *Moore* it was decided that negotiable Louisiana bonds, fraudulently reissued by the Treasurer of the State, were nonenforcible nullities, though in the hands of an innocent holder (44 La. Ann., 209): and a like decision was made in the case of *Branch* v. *Commissioners of Sinking Fund,* wherein *bona fide* holders sought, without success, to compel the funding of certain negotiable Virginia bonds that had been stolen and put on the market after redemption by the State. 80 Va., 427 (S. C., 56 Am. Rep., 596). See, also, *Chemung Bank* v. *Chemung Co.,* 5 Denio, 517.

Having been previously advised of the county's insistence, as subsequently embraced in its second ground of defense, the complainant, in filing his bill, impleaded also the Bank of Lewisburg, from which his testatrix purchased two of the bonds in suit (that for $1,000, and one of those for $500), and prayed in the alternative for a recovery against it "for having sold" to her "invalid or fraudulent or worthless bonds." The bank defended upon several grounds, but mainly upon the averment that it bought and sold these two bonds in the due course of its business, and in the utmost good faith. The Chancellor dismissed the bill as to this defendant also, and the Court of Chancery Appeals affirmed his decree. The latter Court found, as a fact, that complainant's testatrix bought these two bonds from the bank, and paid full value therefor, without notice of any defect in them, and that the bank made the sale in good faith, and without "notice that the bonds were other than they purported to be," though they in reality had been paid, canceled, and fraudulently put on the market again, as previously stated. Upon these facts it held that the bank impliedly warranted its title and the genuineness of the bonds, but did not warrant that they were originally issued by legislative authority, and, therefore, that the bank's "liability" for the breach of the warranty so made was neutralized by its "nonliability" for the absence of that which it did not warrant.

The Court was undoubtedly right in its statement

of those elements as to which there was and to which there was not an implied warranty (*Otis* v. *Cullum*, 92 U. S., 447; *Ruohs* v. *Bank*, 94 Tenn., 57, 67; Simonton on Municipal Bonds, Secs. 113, 114), and, yet, its conclusion that the bank's "liability" under the warranty it did so make, was neutralized by its "nonliability" under that it did not make, is a *non sequitur.* It could hardly be true that clear liability for the breach of a warranty as to one vital matter is defeated by the mere absence of a warranty as to another vital matter, or that a person confessedly liable on one ground shall escape a recovery because not liable on another ground also.

Differently stated, that Court's proposition was that the bank incurred no enforceable liability by the breach of its implied warranty of title and genuineness, because the bonds, if they had been such as they were warranted to be, would, nevertheless, have been invalid on account of having been issued without legislative authority, as to the existence of which there was no implied warranty, and that, being so invalid, they would have been lost to the complainant for that reason without more, and, consequently, the bank's breach could have caused no injury that would not otherwise have resulted. This conclusion is likewise unsound. The bank sold the bonds to the complainant's testatrix, and received her money for them upon the implied warranty already stated, and, having done so, it would not be allowed

to escape responsibility for its misrepresentation, by showing that she would have lost her investment through some other infirmity of the bonds, even though its representation had been true. If its misrepresentation would, of itself and alone, have been sufficient to create a liability, that liability would not be escaped by showing that something else would have caused the same loss. Besides, it does not appear that any loss would have been sustained on these bonds had they been what the bank impliedly warranted them to be. On the contrary, the inference is very strong that they would, in that case, have been paid, or refunded by the county, as have been nearly all of the whole original series. Indeed, these particular bonds have themselves once been paid without objection on the part of the county.

But this discussion need not be pursued further, for, as seen in an early part of this opinion, the $115,-000 of bonds must now be held to have been, years ago, finally and conclusively adjudged to have been issued upon competent legislative authority, and, thereby, the reason upon which the Court of Chancery Appeals placed the bank's nonliability is entirely dissipated.

What, then, is the true legal status of the bank in relation to its transaction with the complainant's testatrix? In every unqualified sale of negotiable bonds, as this one was, the seller, by implication of law, warrants that he has a good title, and that

the bonds are genuine, and if the warranty be breached, he becomes liable to the buyer for the loss occasioned thereby. *Porter* v. *Bright*, 82 Pa. St., 443; *Otis* v. *Cullum*, 92 U. S., 447; *Ruohs* v. *Bank*, 94 Tenn., 57, 67; Simonton on Municipal Bonds, Sec. 113; *Michel* v. *Valentine*, 10 Rob. (La.), 404; *Pugh* v. *Moore*, 44 La. Ann., 209.

The last two cases cited are precisely like this one in principle, and practically the same upon their facts. In the former one (*Michel* v. *Valentine*), the buyer sued the seller of a United States treasury note that had been canceled and by a thief put in circulation again, and in the latter (*Pugh* v. *Moore*), the buyer sued the seller of certain State bonds that had, by its Treasurer, been fraudulently reissued, and in each instance the purchaser was allowed a recovery for the amount paid, upon the ground that there had been a breach of the implied warranty of title and genuineness. The bank in this case sold to the complainant's testatrix bonds that had been paid and canceled by the county, and thereafter purloined and fraudulently put upon the market again by some unknown person, and, in making the sale without qualification, it impliedly warranted that it had a good title and that the bonds were genuine. The warranty was broken the moment it was made, and the bank became liable at once for the price paid. The bank's good faith in the sale cannot affect the question of its legal responsibility. Its fair intention does not render its breach any less certain

in point of fact, or any less hurtful to its equally innocent customer, whose money it received without any real consideration. Speaking on this point in *Porter* v. *Bright*, the Court observed: "It makes no matter whether the vendor knows his title to be bad or not, nor how entirely innocent he may be of any fraud in the transaction. What he has sold proves worthless." 82 Pa. St., 444.

In the present case, the bank impliedly said that it had a good title to outstanding bonds, when it had not, and that the bonds were genuine, when they were not. It follows, therefore, that the complainant is entitled to recover from the bank the amount it received from his testatrix for the bonds, with interest thereon from the time she paid it, less any interest that may have been collected on the bonds in the meantime.

The decree of the Court of Chancery Appeals will be affirmed as to the county and reversed as to the bank, for the reasons stated in this opinion.